NO.19-

## In the

## Supreme Court of the United States

---

PETER R. RUMBIN

*Petitioner*

V.

ARNE DUNCAN SECRETARY OF EDUCATION; US DEPARMENT OF EDUCATION; TIMOTHY GEITHNER, UNITED STATES DEPARTMENT OF TREASURY; BETH HARRIS; DOUGLAS R. EDWARDS, WELLS FARGO BANK;

*Respondents*

---

On Petition for a Writ of Certiorari to the
United States Second Circuit Court of Appeals

---

# PETITION FOR A WRIT OF CERTIORARI

---

IRA B GRUDBERG
COUNSEL OF RECORD
114 LAUREL CREST ROAD
MADISON, CT 06443
(203)-234-1374
ATTORNEY FOR PETITIONER

January 28, 2020                              *COUNSEL FOR PETITIONER*
SUPREME COURT PRESS              (888)958-5705              BOSTON, MASSACHUSETTS

i

## QUESTIONS PRESENTED

1. Whether the courts should overrule the decision of the District Court of Connecticut (11-cv-904 (CSH)), which granted the Respondents' motion to dismiss the action. This decision violates the black letter law in the decision *Plaut v. Spendthrift Farms*, 514 U.S. 211 (1995) and *U.S. Government v. Espinosa*, March 23, 2010.

2. Whether the court should question the constitutionality of the Government resorting to "Self-Help" in order to do an "end run" around a prior court ruling.

3. Whether the U.S. Government should be allowed to make an unlawful seizure of money and property without due process.

ii

# LIST OF PROCEEDINGS

United States Court of Appeals for the Second Circuit
No. 18-3488
*Peter R. Rumbin, v. Arne Duncan, Secretary of*
*Education, U.S. Dept. of Education, Et Al.*
Date of Final Opinon: July 8, 2019
Date of Reconsideration Denial: September 3, 2019

---

United States District Court for the District of Connecticut
Civil Action No. 3:11-CV-904 (CSH)
*Peter R. Rumbin v. Arne Duncan, Et Al.*
Date of Order: November 1, 2018

iii

# TABLE OF CONTENTS

|  | Page |
|---|---|
| QUESTIONS PRESENTED | i |
| LIST OF PROCEEDINGS | ii |
| TABLE OF AUTHORITIES | vi |
| PETITION FOR A WRIT OF CERTIORARI | 1 |
| OPINIONS BELOW | 1 |
| JURISDICTION | 1 |
| STATEMENT OF FACTS | 2 |
|     A. Preliminary Statement | 2 |
|     B. Introduction | 2 |
|     C. Statement of the Case | 8 |
|     D. Relief Sought | 16 |
| REASONS FOR GRANTING THE PETITION | 16 |
|     I. THE JUDGEMENT SHOULD BE REVERSED BECAUSE APPELLANT HAS MERITORIOUS CLAIM THE RESPONDENTS' CLAIMS ARE BARRED BY EQUITABLE ESTOPPEL. | 16 |
|     II. LEGAL RATIONALE SUPPORTING PLAINTIFF' CASE AGAINST THE DEFENDANTS | 22 |
|     III. THE JUDGEMENT SHOULD BE REVERSED ON PROCEDURAL GROUNDS | 26 |
|     IV. DUE PROCESS VIOLATION: VINDICTIVENESS | 28 |
|     V. CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED | 29 |
|     VI. THE COURT'S POWER TO GRANT RELIEF | 31 |
| CONCLUSION | 31 |

iv

**TABLE OF CONTENTS** – Continued

Page

**APPENDIX TABLE OF CONTENTS**

**OPINIONS AND ORDERS**

Order of the United States Court of Appeals for the Second Circuit (July 8, 2019) ..................... 1a

Omnibus Ruling on Plaintiff's Motion to Reopen Case. Motion for Appointment of Counsel, and Motion to Transfer Judge (November 1, 2018) ........................................... 3a

Order of the United States Court of Appeals for the Second Circuit (August 24, 2017) .............. 12a

Order of the United States Court of Appeals for the Second Circuit (May 19, 2017) ................... 14a

**OTHER DOCUMENTS**

Plaintiff's Memorandum in Opposition to USA Memorandum to Dismiss (July 23, 2012) ........ 16a

Affidavit of Peter Rumbin (July 24, 2012) ................................................. 22a

Motion to Dismiss (September 26, 1990) ..................................... 25a

Notice of Service of Offer of Judgment (August 21, 1990) ............................................ 27a

Motion for Leave to file Amended Answer (July 20, 1990) ................................................. 29a

Amended Answer of Defendant Peter R. Rumbin (July 20, 1990) ................................................. 31a

v

# TABLE OF CONTENTS – Continued

Page

Plaintiff's Initial Motion For Extension of Time
to Answer or Object to Interrogatories and
Respond to Request for Production and
Admissions (December 22, 1989) .................... 35a

Defendant's Response to Plaintiff's First Set of
Interrogatories, First Request for Production
of Documents and First Requests for
Admissions (January 19, 1990) ........................ 37a

National Direct Student Loan Note
(March 29, 1977) ...........................................: 49a

Student Loan Interim Note
(October 28, 1977) ........................................ 56a

Student Loan Interim Note
(December 21, 1978) ...................................... 62a

Defendant's Original Answer
(November 3, 1989) ....................................... 68a

Offset Statement
(September 13, 2017) ...................................... 71a

vi

## TABLE OF AUTHORITIES

Page

### CASES

*Ashcroft v. Iqbal,*
    129 S.Ct. 1937 (2009) ........................................... 27

*Bell Ad. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................ 27

*Buckley v. New York,*
    U.S. Dist. Lexis 190837 (2012) ........................... 27

*Coppola v. Coppola,*
    243 Conn. 657 (1998) ......................................... 26

*Dolan v. Connolly,*
    794 F.3d 290 (2nd Cir. 2015) ............................... 5

*Erickson v. Pardus,*
    55 U.S. 89 (2007) ............................................... 28

*Frank E. Hess v. Dumouchel Paper Company,*
    154 Conn. 343 (1966) ......................................... 20

*Glazer v. Dress Barn Inc.,*
    274 Conn. 33 (2005) ........................................... 18

*Godley v. United States,*
    5 F.3d 1473 (Fed. Cir. 1993) ............................... 21

*Hendrickson v. U.S.,*
    791 F.3d 354 (2nd Cir. 2015) ................................ 5

*J.E.T.S., Inc. v. United States,*
    838 F.2d 1196 (Fed. Cir. 1988) ........................... 21

*K&R Eng. Co. v. United States,*
    616 F.2d 469 (Ct. Cl. 1980) ................................. 21

vii

## TABLE OF AUTHORITIES—Continued

Page

*Kosakow v. New Rochelle*
    *Radiology Associates, P.C.,*
    274 F.3d 706 (2 Cir. 2001) ...................... 17

*Little v. Streater,*
    452 U.S. 1 (1981) ................................... 4

*Plaut v. Spendthrift Farms, Inc.,*
    514 U.S. 211 (1995) ............................ 3, 16, 23, 25

*Snow v. Calise,*
    174 Conn. 567 (1978) .......................... 27

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2nd Cir. 2001) ............... 27

*Triestman v. Fed. Bureau of Prisons,*
    470 F.3d 472 (2d Cir. 2006) ................. 21, 28

*United Student Aid Funds, Inc. v. Espinosa,*
    559 U.S. 260 (2010) ............................ 6, 22

*Washington v. James,*
    782 F.2d 1134 (2d Cir. 1989) ............... 28

*Zinermon v. Burch,*
    494 U.S. 113 (1990) ............................ 27

## STATUTES

12 U.S.C. 5565 ...................................... 22, 31

15 U.S.C. § 1692 ................................... 7

28 U.S.C. § 1254(1) .............................. 1

28 U.S.C. § 2201 .................................. 22

Dodd-Frank Wall Street Reform and Consumer
    Protections Act 2010, Pub. L. 111–203 ............... 4

viii

## TABLE OF AUTHORITIES—Continued

Page

**JUDICIAL RULES**

D. Conn. L. Civ. R. 7(c) ............................................. 28

Fed. R. App. P. 32 ................................... 5, 6, 11, 26

Fed. R. Civ. P. 12(b)(6) ............................................. 26

1



## PETITION FOR A WRIT OF CERTIORARI

Petitioner Peter R. Rumbin Respectfully Petitions this Court for Writ of Certiorari to review the Judgment issued in the United States Court of Appeals for the Second Circuit.



## OPINIONS BELOW

The Order of the United States Court of Appeals for the Second Circuit, dated July 8, 2019 is reprinted in the Appendix hereto at App.1a. The Second Circuit Order Denying a Motion for Reconsideration on September 3, 2019 is reprinted in the Appendix hereto at App.27a.



## JURISDICTION

The Second Circuit denied a timely filed motion for Reconsideration on September 3, 2019. This Court has Jurisdiction Pursuant to 28 U.S.C. § 1254(1).

## STATEMENT OF FACTS

### A.  Preliminary Statement

The Appellant, Peter R. Rumbin, hereby appeals to the United States Supreme Court to overturn the dismissal of a civil student loan before the Second Circuit Court of Appeals. The present case involves a dispute over the Government's wrongful garnishment of the Appellant's monthly social security benefits to recover the alleged student loan debts dating back 40 years, that were settled by stipulated agreement with prejudice against the Departments of Education and Treasury in 1990.

### B.  Introduction

This case originates from a dispute with the U Chicago over student loans from 1977-1978.

In 1989, the U.S. Departments of Education (DoEd) and Justice (DOJ) through its U.S. Attorney (Atty), Christine Sciarrino, sued Peter R. Rumbin, (defendant at the time), for outstanding student loans borrowed in 1977-78, while a student at the University of Chicago (U. Chicago). In 1989-1990, the claim by stipulated agreement among the parties was settled in Federal Court (Bridgeport, CT) before Judge Warren Eginton, and was dismissed with prejudice against the Government (App. 12a). Judge Eginton held a hearing with Rumbin; U.S. Atty Christine Sciarrino failed to appear until the second hearing, where she signed the stipulated agreement before Judge Eginton and Atty David Leff, who represented Peter R. Rumbin in that case. The late Atty Robert C. Ruggiero, Jr. also

represented Rumbin in that case initially. All the
loans were in default and all loans were borrowed in
the same time period. All loans were inventoried in the
government's interrogatories and discoveries requested
by U.S. Atty Sciarrino in 1989-90 (App.27a, 29a, 35a).
The borrower won in Federal Court with a court order
that dismissed all outstanding loans on consent of
the parties, with prejudice against the Government.
Hence, any claims of the DoEd or Treasury (USDT)
were null. The Government did not attempt to modify
or appeal Judge Eginton's ruling after it was rendered.
In 2010, a new statute was passed that permitted the
U.S. DoEd and USDT to take Peter R. Rumbin's money
every month as an offset, including his income tax
return and it is collecting aggressively, on the verge
of foreclosing on the borrower's home in CT.

Because of the *Plaut v. Spendthrift Farms*, 514
U.S. 211, (1995) Supreme Court ruling: "No statute
can retroactively vacate any adjudicated case that is
final. The Supreme Court holds that Congress cannot
circumvent a decision by changing the rules later."
This is a matter of the "law of the case". The defendants
have not only committed breach of contract but also
violation of a court order which is even worse than
breach of a settlement. The creditors resorted to "self-
help" under the new statute.

Wells Fargo Bank (WFB) assumed the loans from
the prior Connecticut Savings Bank and Connecticut
Student Loan Foundation, where the borrower resides.
The villain is the U. Chicago that did not credit the
PELL Grants to pay the plaintiff's bill but pocketed
the funds. This fraud was revealed when the Harvard
Financial Aid Office obtained the U. Chicago's financial

aid transcript for Mr. Rumbin. (At that time, Mr. Rumbin was a student at Harvard.)

U. Chicago was engaged in predatory lending and targeted the most needy and vulnerable students as a means to enrich itself at the expense of the economically poor students. The Dodd-Frank Wall Street Reform and Consumer Protections Act 2010, (Citations: Pub. 1.111-203; Statutes at Large 124 Stat. 1376-2223 would apply for recovery of damages against these defendants.

In the Second Circuit Court second ruling, the judges provided a roadmap for the U.S. District Court in Connecticut to follow (App.D), but Judge Charles S. Haight, Jr defied that ruling. He never permitted a new complaint nor held a hearing. He did not assign an attorney to represent the plaintiff. He did not seek any discovery or interrogatory, and denied the motion to transfer the case to Judge Eginton, who had presided over the original case in 1989-1990, and who knew why he ruled as he did.

In the U.S. Supreme Court case, *Little v. Streater*, 452 U.S. 1 (1981), the court ruled that the State of Connecticut had to pay for a DNA test to prove a paternity claim. Similarly, a lawyer assigned to represent the plaintiff could have provided the U.S. District Court Judge Haight with a new complaint or, if required, the U.S. Second Circuit Court of Appeals could have received a new brief (App.3a). By refusing to appoint counsel to represent the plaintiff, he denied an avenue for the plaintiff to provide the court with a new brief. Then the court would have learned what relief the plaintiff sought, and the case would have been well articulated. Instead, the case must now be reviewed by the U.S. Supreme Court for

5

justice to be served, and for the plaintiff to avoid losing his house, Social Security and monies. Meanwhile, the defendants have been unjustly enriched.

The cases *Hendrickson v. USA,* 791 F.3d 354, 358-63 (2nd Cir. 2015) and *Dolan v. Connolly,* 794 F.3d 290, 295 (2nd Cir. 2015) address the breach of contract and permittance of a new complaint. The defendants have breached their contract from the 1989-1990 settlement before Judge Eginton. In the student loan case, the defendants signed and agreed to withdrawal of suit against the plaintiff (then defendant) by stipulated agreement of the parties, dismissal with prejudice against them. This ruling and court order signed by Judge Eginton precludes the defendants from resorting to "self-help".

The defendants are barred from circumventing this court order and trying to do an "end-run" around the court order that the defendants signed in 1990. Because of the dismissal with prejudice ruling and court order, the defendants cannot resort to any further litigation and this ruling prevents them from collecting any money or property under *res judicata.* Furthermore, the prior decision is grandfathered in under the laws enforced at that time.

The plaintiff's previous brief was authored by Attys Gunilla Faringer and Charles Darlington both of Appeals Press, White Plains, NY. Both attorneys violated Local Rule 32: they failed to file an appearance, acknowledge authorship of their brief, affix their names and address to their brief, sign their brief or, finally, to appear before the court to defend their brief. These two attys did this act without the prior knowledge or consent of the plaintiff. The New York Bar has cited them both for ignoring the

Federal Rules. The citation is part of their permanent record. If they violate any other rules, they will be disbarred. (App.14a).

The Second Circuit Court issued a second ruling after the plaintiff provided proof that he did not violate Local Rule 32, but rather the court's rules were violated by Faringer and Darlington. These two attorneys were paid to write the brief but never returned these funds to the plaintiff. This explains the reason for the second ruling by the Second Circuit Court of Appeals on August 24, 2017, after the May 29th 2017 ruling. The misconduct of Attys Faringer and Darlington was most harmful to the plaintiff.

Upon further research, a U.S. Supreme Court Ruling involving student loan debt. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (March 23, 2010) states that a bankruptcy judge's ruling is final and cannot be revisited years later because the lender did not like the decision, and did not appeal it in timely manner, and may have omitted some loan by mistake. In the plaintiff's case, the U.S. DoEd, USDT, the U. Chicago, and Connecticut Savings Bank, now WFB, were dismissed with prejudice against them, breached their contract from the 1989-1990 settlement before Judge Eginton. They are guilty of misconduct because of their illegal collections of the plaintiff's money (*U.S. Aid Fund v. Espinosa; Plaut v. Spendthrift Farm*).

There were no further proceedings in this case from 1990. The defendants did not attempt to vacate, appeal, modify, or alter the court's order of 1990. They did not file a motion for reconsideration. Furthermore, all of the loans were inventoried and explained

7

in the interrogatories and discoveries sent to Rumbin by then U.S. Atty Christine Sciarrino, who represented the U.S. DoEd and USDT in the 1990 and the present case (35a). This is the same situation as in the *U.S. Aid Fund vs Espinosa* case, where someone later claims that they may not have included all of the loans in all of the court filing, but the presiding judge's ruling was upheld. The DoEd and USDT are barred by *res judicata*. This appeal is meritorious because of the previous dismissal with prejudice against them: U.S. DoEd and USDT, U. Chicago, the Connecticut Savings Bank (WFB). Hence, the defendants' monetary collection for the past ten years is illegal.

In the Federal Debt Collection Practice Act (1977) that governs debt collections, there is a provision that says you are barred from collecting on a debt that is based upon fraud. Fraud contains two sets of laws: one for the Federal Government and another for private lenders. The Federal Government does not have the right to sue because of private entities: U. Chicago, Connecticut Savings Bank (WFB) are private institutions and private banks.

The U.S. Government cannot collect the plaintiff's money without suing the plaintiff in court to recover these funds. Yet, the DoEd and USDT are currently collecting monies (currently $139 each month), earned income tax credit, and eventually real estate (the plaintiff's house) without having sued the plaintiff, without having won their case in court and being awarded money and/or property. The 1990 court order remains in force and binding on the parties and private lenders in this case.

Judge Haight's bias and favoritism towards U.S. Atty Sciarrino and the U.S. Gov. was obvious when

he dismissed the plaintiff's case, and upheld Atty Sciarrino's erroneous statements. He stated that transferring the case to Judge Eginton was then "moot". Because of Judge Haight's dismissal of the plaintiff's case, and subsequent refusal to transfer the case to Judge Eginton, the U.S. Government continues to offset the plaintiff's assets (App. 3a). Since no hearing was ever held in the U.S. District Court of Connecticut or in the Second Circuit Court of Appeals in Manhattan, NY, the plaintiff would like the matter to be heard and settled in the Supreme Court of United States.

## C.   Statement of the Case

Mr. Rumbin attended the University of Chicago (U. Chicago) between 1977 and 1978. When he enrolled at the University he applied for federal Pell/ BEOG/grants to finance his studies. He was informed that the grants would be credited to his tuition before any other available funds. However, the U. Chicago also requested that he apply for student loans, which he did. Therefore, he executed two notes in the amounts of $1,650.00 and $890.00. Later, he also took up two additional loans in the amount of $2,500 each, for a total of $5,000 ("the GSL loans") which is the subject matter of the within litigation.

When he attended Harvard University the next year, their financial aid office informed him that, unbeknownst to him, he had Pell grant funds available to him at U. Chicago that had never been used towards his tuition. It became clear to him that he had been deceived by the University to go into debt for his tuition that would have been unnecessary had the grants been applied to his tuition as was required

9

under federal law and as he had been promised by
the University. He also learned that the University
had returned the grant money to the Department of
Education after it had been audited; however, it did
not return Petitioner's borrowed money, and he was
still responsible for paying back a debt that had been
fraudulently incurred.

When he was unable to take out further loans,
and as a direct result of the U.Chicago's unlawful
withholding of his grant moneys, Mr. Rumbin was
forced to withdraw from the U. Chicago, a situation
that would clearly never have occurred had his grant
money been used by U.Chicago as intended. While
unlawfully withholding Rumbin's grant monies--
possibly amounting to not just embezzlement but
fraud, predatory lending and racketeering-the Univer-
sity suggested to his parents that they take out a
second mortgage on their home to allow him to pursue
his degree. However, his parents' application for a
second mortgage was declined.

Mr. Rumbin's mother was dying of cancer at the
time. As a result, Mr. Rumbin had no choice but to
terminate his studies at U. Chicago and finish his
degree at another institution. This was possible only
after the University finally released his academic
transcript (as a result of the U.S. Department of
Education investigation of financial fraud aid irregular-
ities), of the unlawfully incurred debt, and after lengthy
and diligent work by Attorney Ira B. Grudberg. Mr.
Rumbin was never provided with a proper accounting
of his financial aid status with the University in
spite of repeated requests, including a Motion for
Disclosure.

Date Filed 12/16/2025 Case 1:26-cv-10247-ADB    Document 14-18    Filed 02/18/26    Page 19 of 104
Superior Court - Essex
Docket Number 2577CV00816

10

University of Chicago was one of many colleges around the country that were revealed to have been engaging in misappropriation of federal grant monies and other irregularities in connection with student financing. A great number of schools, including Columbia University, U. Penn, Johns Hopkins University, U. Southern California and New York University were ordered to repay millions of dollars in federal grant money. When Mr. Rumbin's loans went into repayment status he was unable to make payments due to financial difficulties. The loans were eventually declared in default on September 1, 1987 and the loans were assigned to the Department of Education ("DoEd"). On October 17, 1989 the United States of America commenced a lawsuit against Mr. Rumbin for repayment of the debt. That action was dismissed with prejudice and the debt was written off on September 24, 1990.

However, unbeknownst to the Petitioner, the two GSL loans in the total amount of $5,000 were not referred to the DoEd for collection until December 14, 1998. Not until March of 2011 did the DoEd began collecting this debt by garnishing his social security benefits by $76.00 (now $139) per month under the Higher Education Act, 20 U.S.C. § 1091(a)(1), thereby reducing his monthly social security payments to currently $750.00. It is unknown why the GSL loans were not referred to the DoEd until 8 years after the dismissal of the original action in 1990 and not enforced until 21 years after the dismissal.

According to loan documents submitted by the Respondents as exhibits to their motion to dismiss the total outstanding balance of those two loans on August 1, 2011 amounted to $16,023.00. (R. 73) Thus

11

the DoEd allowed the debt to accumulate to three times it original amount before it began to enforcing it. Today it has grown to almost $36,000, nearly seven times the original loan amount.

Therefore, on May 20, 2011, the Petitioner commenced legal action to stop the garnishing of his social security payments and to reclaim funds collected unlawfully, including interest together with damages to compensate him for the harm caused to his credit worthiness and the time and effort spent on this matter over many years as well as the loss of opportunity caused by his forced withdrawal from his program of studies at the University.

The Respondents subsequently filed a Motion to Dismiss on August 4, 2011. Said motion was denied without prejudice on June 25, 2014 and the court requested the Respondents to submit evidence regarding the discussion of the GSL loans during the negotiations preceding the dismissal in 1989. The Respondents submitted a renewed motion to dismiss on July 18, 2014. Mr. Rumbin filed an Appeal and Objection on August 6, 2014, which the court construed as a motion for reconsideration. Petitioner's motion was denied on February 17, 2016 and Respondents' renewed motion to dismiss was granted on February 17, 2016. A judgment was entered on February 22, 2016 (App.1a,3a).An appeal was filed in the Second Circuit Court of Appeals (NYC) in 2017 by Appeal Press attorneys Gunilla Faringer, and Charles Darlington of White Plains, NY. The Court ordered a refiling of a new complaint dated August 24, 2017 (12a) as the two lawyers were caught violating Rule 32. They refused to apologize to the court. Final judgement of U.S. District Court Omnibus ruling on plaintiff's

motion to re-open the case, get appointed counsel, and transfered to Judge Eginton, who had heard the original case in 1989-90, was denied by Judge Haight, U.S. District Court, November 1, 2018 (App.3a) He issued a Mandate on September 10, 2019 (App.1a). Appeal to the U.S. Supreme Court on January 28, 2020 followed immediately thereafter.

Final judgment of U.S. District Court (CT) Omnibus ruling on plaintiff's motions to re-open the case, have counsel appointed, and transferred to Judge Eginton, who had heard the original case in 1989-90, was denied by Judge Haight, U.S. District Court (CT), November 1, 2018. (App.3a). U.S. Second Circuit Court of Appeals Judges—Debra A. Livingston, Raymond J. Lohier, Jr., (absent: Judge Carney)—issued a Mandate on July 8, 2019. (App.1a). Appeal to U.S. Supreme Court on January 28, 2020 followed immediately thereafter.

Federal court has equitable jurisdiction over the question of the plaintiff's student loans. The plaintiff seeks equitable relief from the court because it is grossly unfair and unreasonable to ignore the dismissal with prejudice against the U.S. DoEd and USDT by Judge Eginton in 1990 regarding all the student loans. The plaintiff was sued in federal court for student loans by the USDT and DoEd in 1989. The case was dismissed in September of 1990, with prejudice against the U.S. Dept. of Treasury and Education by the Judge Eginton, U.S. District Judge (Bridgeport, CT).

In the discoveries and interrogatories sent by the U.S. Attorney's office to the plaintiff, Peter R. Rumbin, the U.S. Atty Sciarrino specifically asked the plaintiff to identify all of the loans, and the

plaintiff disclosed both the National Direct Student Loans and the Guaranteed Student Loans. Thus, the plaintiff raised as a defense to the 1989 collection brought against him by the U.S. that he was fraudulently induced to accept the various loans. All the loans were taken out in the same time period and no additional loans were ever taken out by the plaintiff. According to the Defendants, all the loans were "declared in default on September 1, 1987," (App.35a, 56a, 62a, 68a) and were therefore assigned to the United States.

The Government brought suit against the plaintiff in 1989 for defaulting on two National Direct Student Loans. The Guaranteed student loans were not simply discussed by the parties in the 1989 litigation—they were specifically pleaded in the plaintiff's special defenses, and the plaintiff asks that the Defendants now be equitably estopped from any further administrative collection actions.

For 30 years, it was understood by all parties that all the loans in question were included and settled in the 1990 dismissal with prejudice decision. At that time, the U.S. Government acted like all the loans were settled for the nearly three decades since the dismissal.

The U.S. DoEd and USDT received discovery and interrogatories, making all loans known to all parties involved during the previous litigation. They are barred by law from now ignoring Judge Eginton's ruling and should not be permitted to now take the plaintiff's Social Security, property and house because all the loans were included in the Judge Eginton's decision.

14

The defendants (U. Chicago, Wells Fargo Bank, USDT and DoEd) engaged in predatory lending to the plaintiff, Peter R. Rumbin. The U. Chicago received BEOG (Pell Grant) funds to pay for the plaintiff's education bill. However, these funds were not credited to his account. The U. Chicago induced the plaintiff to apply for unnecessary student loans. Had the BEOG (Pell Grant) funds been credited to his account, he would not have needed these loans. Thus, the defendants unjustly enriched themselves.

Chicago's improprieties were discovered upon receipt of the plaintiff's U. Chicago's financial aid transcript at Harvard, (where the plaintiff was a student at the time), which revealed that the Pell funds were unused and still available. The plaintiff was advised to notify the DoEd of this irregularity. The DoEd conducted an investigation, which resulted in the U. Chicago returning the unused BEOG (Pell Grant) funds. But the U. Chicago did not refund the student loan money.

The plaintiff never got to argue the case before the court because there were too many errors in procedure (App.1a). The plaintiff is now represented by legal counsel, Ira B. Grudberg, and is prepared to litigate the case in court.

The Defendants claim a statute of limitation. However, the plaintiff has no statute of limitation to use for a defense for the unjust collection occurring today. This is grossly unfair, as are some of the provisions that the Congress created in not requiring the DoEd and USDT to follow, among other legal provisions, due process.

15

Judge Haight defied the U.S. Second Circuit Court of Appeals in its second ruling and refused to permit a new complaint, hold a hearing, appoint counsel, or transfer the case the original Judge Eginton of Federal Court in Bridgeport CT. (App.3a) The late Judge Eginton was alive at the time of this request for the motion for transfer and could have heard the case that he ruled upon in 1989-1990.

In the Second Circuit Court second ruling, the judges provided a roadmap for the U.S. District Court in Connecticut to follow, but Judge Haight defied that ruling. Because of the dismissal with prejudice ruling and court order, the defendants cannot resort to any further litigation and this ruling prevents them from collecting any money or property under *res judicata*.

The defendants are guilty of misconduct because of their illegal collections of the plaintiff's money. There were no further proceedings in this case from 1990. The defendants did not attempt to appeal, modify or alter the court order of 1990 issued by Judge Eginton. Hence the defendants' collection for the past ten years is illegal.

The plaintiff cannot discover the pretext or "secret" statute that permits the defendants from collections without due process. The defendants' collections are unlawful. Judge Haight has ignored the 1990 court ruling and order against the defendants, even though this order remains in force today.

An Affirmative action claim should be filed and considered by the court for the decades of harm, hardship, and disruption to the plaintiff's life, education, creditworthiness, and career, as well as the

time and ongoing expense of decades of litigation.
The plaintiff would like the matter to be heard and
appealed in the Supreme Court.

### D.  Relief Sought

**1.** To cease and desist the unlawful seizure of
property and monies; ignoring a prior judge's ruling
of dismissal with prejudice against the defendants by
stipulated agreement of the parties; *Plaut v.
Spendthrift Farms, res judicata, United Student Aid
Funds, Inc. v. Espinosa,* No appeal or modification of
1990 ruling ever sought by defendants for over 30
years. **2.** Return of what monies have been seized;
total sum, with interest, of all payments, tax returns,
fees, penalties, interest etc. **3.** A Court order stopping
any further taking of any funds or property from the
plaintiff, Peter R. Rumbin. **4.** Reimbursements of all
legal counsel fees and expenses as a result of the
defendants' actions. **5.** Counter suit on predatory
lending, Dodd-Frank Consumer Protection Act or
other applicable laws or relief as the court or legal
counsel deem appropriate in this case.



## REASONS FOR GRANTING THE PETITION

### I.  The Judgement Should Be Reversed Because Appellant Has Meritorious Claim The Respondents' Claims Are Barred By Equitable Estoppel.

In its order, the court below stated that under
the limited application of equitable estoppel in
federal law, a party can be estopped from pursuing a

17

claim or defense where "the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely on it and the other party reasonably relies on it to [his] detriment". *Citing Kosakow v. New Rochelle Radiology Associates, P.C.,* 274 F.3d 706 (2 Cir. 2001).

The court then goes on to state that the doctrine is not applicable to the case at bar because the Government did not make any misrepresentations of fact when it requested Rumbin to list all student loans he had taken out in the interrogatories preceding the stipulation for dismissal. However, it is respectfully submitted that the doctrine of equitable estoppel was misapplied by the court below. Contrary to what the district court found, there can be no doubt that doctrine of equitable estoppel is in fact applicable to this case, to wit, to the underlying facts that form the basis for Appellant's case.

At the time Mr. Rumbin began his studies at the U. Chicago, he was informed by the that his grant money would be credited to his tuition. He was also informed that even though he had received Pell grants he was obligated to take out student loans. Appellant reasonably relied on said instructions by the U.Chicago to his detriment, as overwhelmingly evidenced by the record in this case.

Equitable estoppel is a doctrine that operates in many contexts to bar a party from asserting a right that it otherwise would have but for its own conduct. In its general application, we have recognized that there are two essential elements to an estoppel-the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and the

other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done." *Glazer v. Dress Barn Inc.*, 274 Conn. 33, 60 (2005).

Because of his reasonable reliance on the implied conditions in the agreement, Appellant was led to believe that his entire educational debt was included in the stipulation of settlement and because Defendants' failure to enforce the allegedly outstanding debt until after 21 years, after the dismissal of the other loans contributed to this belief, Appellant abstained from taking timely action to resolve the $5,000 debt, which caused said debt to increase threefold before he was made aware of it. Under these circumstances it is clear that the doctrine of equitable tolling applies to this action and it was error by the court below to grant the Respondents' motion to dismiss.

The Appellant is entitled to a full accounting by the U. Chicago. The University is obligated to provide full disclosure of Mr. Rumbin's financial aid package, including all available grants and how they were applied. Pursuant to the Higher Education Act of 1965, the Higher Education Opportunity Act of 2008 and Section 128 and Section 140 of the Truth in Lending Act (1968), it is clear that the University is obligated to provide full disclosure of Mr. Rumbin's financial aid package, including all available grants and how they were applied. However, to this day, for unknown reasons, it continues to refuse to do so and does not comply with Appellant's repeated requests for a full accounting. It is respectfully submitted that by refusing to provide Appellant with full disclosure of the financing of Mr. Rumbin's studies at University,

· 19

the University is in violation of federal law. The judgment should be reversed and the Respondents be compelled to comply with Mr. Rumbin's request for a full accounting and clarification of the facts.

The Appellant relied on implied terms in the Stipulation for Dismissal. Rather than specifying exactly which loans were forgiven, the Stipulation for Dismissal simply stated that "[t]he parties do hereby agree to the dismissal of the above captioned action". The record reflects that Appellant assumed four loans, in the amounts of $1,650.00, $ 890.00 and two loans of $2,500.00 each. Even so, he was not able to meet his tuition bills, and when his parents' application for a second mortgage on their home was denied, he was compelled to withdraw from the University. Had the University not breached its duty by fraudulently withholding his grant monies, he would have been able to continue his studies and graduate from the University. Therefore, as a result of the University's fraud against Appellant his debt was written off after it had been litigated.

During the negotiations preceding the stipulation, Mr. Rumbin was asked to list all the loans he had taken out. Therefore, and because the settlement agreement stated that the parties "do hereby agree to the dismissal of the above captioned action", without specifying what loans it was referring to, and because of all circumstances and discussions held leading up to the stipulation, it is clear that the agreement contained implied terms, to wit, that all Mr. Rumbin's loans were dismissed by the agreement.

Mr. Rumbin reasonably relied on these terms and believed that his entire debt had been written off, until his social security benefit payments were suddenly

20

garnished in March of 2011, over two decades after
his debt had been dismissed. The defendant, the U.S.
DoEd waited twenty-one years after that stipulation
to commence the enforcement, through Treasury offset
with interest that has increased the debt sevenfold.
This is a clear indication that Respondents acted in
the belief that all loans were included in the agreement,
for why else would they have waited 21 years to
enforce the debt, now valued at $36,000.

Christine Sciarrino, an Assistant United States
Attorney in the District of Connecticut, who was
absent from the initial hearing where the loans were
disclosed and discussed, preceding the stipulated
agreement, has lied to the court about the loans. "With
counsel in chambers with Judge Edington, a candid
discussion of all of the facts and issues, arguments
and defenses were laid out and discussed as to all
four of the loans that generated the stipulation for
judgement of dismissal with prejudice and entered
by agreement of both parties on September 24, 1990."
(the late Atty Robert C. Ruggiero, Jr.) (App.25a).

Separate dealings among the parties cannot affect
another transaction so as to constitute a substituted
contract between them unless it was their intention
that such an agreement be consummated. This
intention can be determined from the language used
and the circumstances known to both parties under
which the negotiations were had." *Frank E. Hess v.
Dumouchel Paper Company*, 154 Conn. 343, 348
(1966). Therefore it is respectfully submitted that it
was an error by the court below not to afford Mr.
Rumbin the opportunity to have his case heard by a
factfinder.

21

The debt was incurred as the result of fraud in the inducement and was void *ab initio.* It is clear from the record that the Appellant's debt was incurred as a result of the University's unlawful withholding of his Pell grants. By failing to apply the grant funds towards his tuition in spite of its assurances that it would do so and in violation of federal law, the University fraudulently misrepresented Appellant's financial aid status with the University, and, relying on said fraudulent misrepresentation Appellant was induced to apply for financial aid that he would have not needed had the grants been rightfully credited to his tuition.

The fact that the debt was incurred as a result of fraud in the inducement is admitted by the Defendants, which is clear from their interrogatories that request Appellant to "[d]escribe the fraudulent misrepresentation made to Peter R. Rumbin". Had the grant monies that were lawfully his been credited toward his tuition Appellant would not have been compelled to incur debt that he did not have the means to repay, and neither would he have been forced to withdraw from his studies at the University.

When a contract is tainted by fraud at the inception, the contract is rendered void *ab initio.* The relief for any contract void *ab initio* is cancellation of the contract and forfeiture of any monies paid under the contract. *See, e.g., Triestman v. Fed. Bureau of Prisons,* 470 F.3d 472, 474 (2d Cir. 2006); *K&R Eng. Co. v. United States,* 616 F.2d 469 (Ct. Cl. 1980); *J.E.T.S., Inc. v. United States,* 838 F.2d 1196 (Fed. Cir. 1988) and *Godley v. United States,* 5 F.3d 1473 (Fed. Cir. 1993). Therefore, the judgment should be reversed and the GSL loans be forgiven, on the grounds

that the debt was incurred as a result of the University's fraud in the inducement (Court's Power to Grant Relief 12 U.S.C. 5565 (2006)). 28 U.S.C. 2201 (2018).

## II. LEGAL RATIONALE SUPPORTING PLAINTIFF' CASE AGAINST THE DEFENDANTS

In 1990, the Federal Court in Bridgeport, CT, issued a court order that dismissed the creditors' case on consent of the parties and with prejudice was never vacated or modified. That is law of the case or *res judicata*, because the creditors never appealed or moved to vacate. The U.S. Supreme Court decision *United Student Aid Fund, Inc. vs Espinosa* (559 U S 260 (2010) stated that "once an order goes down, as long as there is adequate notice of the order, it is final. If you do not appeal the order, then the order stands.". The creditors' case on consent of the parties and with prejudice was never vacated or modified. All of the student loans were covered by that order; the creditors were not allowed to collect after that dismissal under the unmodified court order that remains valid to date. No other new student loans were ever incurred after that court order. If there was later enacted federal statute allowing "self-help" collection—no statute has been cited. The plaintiff was grandfathered in and that statute cannot be applied retroactively under *ex post facto* doctrine.

The question of "self-help" raises a Constitutional question that only the Supreme Court can address because of its contradictions. The statue did not include any kind of collection without due process. The case of the U.S. DoEd and Treasury was settled 30 years ago. They violated the privacy of the

plaintiff by obtaining the plaintiff's Social Security number and have used it to avail themselves to his Social Security income and tax return as an offset. If the Plaintiff fails to prevail in the Supreme Court, then the U.S. DoEd and Treasury will seize the plaintiff's house, rendering him homeless. No statue can be construed to later vacate finality of court order. *See Plaut v. Spendthrift Farm* (514 U.S. 211 (1995)) case by SCOTUS, courtesy of the late Justice Scalia. <u>The rational of this one decision is compelling even more so that all others.</u>

The plaintiff's motion is to recover unlawful collections under FRCP 56 for summary judgment and under FRCP 57 for declaratory relief under 28 U.S.C. § 2201. U.S. Treasury has already collected in excess of $16,000 dollars from the plaintiff and wants more than another $16,000 dollars plus interest, penalties and expenses on a $5,000 loan that was settled in 1990. Summary judgment should also include damages under FRCP 56. The attached interrogatories and discoveries substantiate the claim for damages. The interrogatories and discovery clearly inventory <u>all</u> of the loans that were included in this stipulated agreement and show that the loans were taken out in the same time period when the PELL-BEOG grants were awarded to the U. Chicago. They were not applied to pay the plaintiff's educational bill. Unnecessary loans were solicited by U. Chicago to unjustly enrich itself through these financial aid programs *i.e.* predatory lending. The late Attorney Ann Detiere discovered that the Illinois Attorney General has closed colleges in Illinois for similar abuses, and the U.S. DoEd has posted advertisements urging students who suspect

24

financial aid exploitation to contact them through a toll-free telephone number.

By negative inference, the U. of Chicago was permitted to continue to participate in the loan programs only because it returned the PELL Grant funds. None of the plaintiff's PELL funds were spent to pay for his education at U. Chicago. The impropriety of the U. Chicago was discovered by accident when Harvard College requested a financial aid transcript for the plaintiff (student at Harvard at the time).

Harvard financial aid directed the plaintiff to report the problem to the U.S. Dept. of Education in Chicago, IL. As a result of the DoEd investigation of U. Chicago, the U. Chicago refunded all of the PELL funds but not the loan funds. They received the PELL-BOEG grants with consent of the U.S. Treasury. The plaintiff believes that other students were similarly taken advantage of by U. Chicago but are unaware of the abuses. Because of the high attrition rate of the U. Chicago at the time, many needy students assumed unnecessary debt that precluded their completion of their college education. The plaintiff learned about this problem while working in the alumni fund of the U. Chicago while soliciting for funds. The U. Chicago has a 6.5 billion dollar endowment.

There also may be statutory provisions for fees and punitive damages for illegal collections by creditors. The Wells-Fargo Bank has been found lacking in integrity in it's financial conduct and has been required to pay substantial fines and penalties. Its business practices remain inadequate.

The plaintiff also would like the court to consider an "order dismissal" against the U.S. DoEd and

25

Treasury and Wells Fargo Bank. Defendants cannot circumvent a previous ruling of the court by changing the laws and applying them retroactively to a judge's ruling.

In *Plaut v. Spendthrift Farm* the late Justice Scalia stated that the defendants cannot circumvent a previous ruling of the court by changing the laws in applying them retroactively to a judges' ruling. The U.S. DoEd and Treasury are ignoring the previous dismissal with prejudice in order to unjustly enrich themselves with disregard for the U.S. Supreme Court rulings of *Plaut v. Spendthrift Farm* and a breach of contract. In the U.S. Second Circuit Court of Appeals, second ruling it states "on a liberal reading of the plaintiff's case, it appears to be a breach of contract by the U.S. DoEd and Treasury. Furthermore, the statue did not include any kind of offset."

Since the 1989-1990 case and the present case, there has been much negative news and information about college financial aid polices that exploit needy students in their financial aid and lending practices. The defendants cannot protect themselves from immunity and impunity of their fraud. The loans were unnecessary and the plaintiff was induced by fraud to take out loans that were not needed. The Consumer Protection Laws, Dodd-Frank Wall Street Reform and Consumer Protection Act in 2010, (Pub. L. 111-203) are applicable.

Due process was eliminated by Congress to enable the U.S. DoEd and U.S.D.T. to seize students' money and property without going to court and obtaining a judgment. Furthermore, the U.S. DoEd and Treasury take more than the Face Value of the debt.

The University of Chicago is the villain. The stipulated agreement of 1990 did not allow for any other kind of collection without due process. The present collections of the U.S. Depts. of Education and Treasury are unreasonable and unfair given the 1990 court ruling that settled the case 30 years ago. This is <u>Black Letter Law</u> and should be free of any doubt or dispute.

The plaintiff tried to have a lawyer file a new brief to the U.S. Second Circuit Court of Appeals, but no lawyer did this in a timely manner. The attorneys Gunilla Faringer and Charles Darlington violated rule 32 and did not file an appearance or sign the brief that they wrote. Neither attorney would apologize to the court. The New York Bar Grievance Committee found against both of them. Their violation is part of their permanent record and if they break any rules again, they will be barred from the practice of law.

## III. THE JUDGEMENT SHOULD BE REVERSED ON PROCEDURAL GROUNDS.

This appeal is from the judgment that granted Respondents' motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). It is respectfully submitted that it was error by the court below to grant said motion.

It is a well-settled tenet of law that cases should be determined on their merits. "Our practice does not favor the termination of proceedings without a determination of the merits of the controversy." *Coppola v. Coppola*, 243 Conn. 657, 665 (1998). "It is the policy of the law to bring about a trial on the merits of a dispute whenever possible and to secure for the litigant his

27

day in court." *Snow v. Calise*, 174 Conn. 567, 574 (1978). Therefore, courts are generally reluctant to grant motions to dismiss. "Under the now well-established Twombly standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is 'plausible on its face.'" *Buckley v. New York*, 2012 U.S. Dist. Lexis 190837 (citing *Bell Ad. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[D]etermining whether a complaint states a plausible claim for relief will be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009). The within record demonstrates that there are clearly enough allegations of fact that should have prevented the case from being dismissed.

In considering a motion to dismiss, this Court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in the Plaintiffs' favor." *Zinermon v. Burch*, 494 U.S. 113, 118 (1990). "The issue on a motion to dismiss is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2nd Cir. 2001).

It is respectfully submitted that Appellant has stated a plausible claim for relief in his challenge of the Respondents' garnishing of his social security benefit only after allowing it to increase sixfold, and their claim that the forgiveness of his debt did not include the $5,000 GSL loans, which is false.

Furthermore, the Court is respectfully reminded that throughout these proceedings, Appellant has been appearing *pro se*, as he was without the means

28

of retaining counsel, *Pro se* pleadings, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 55 U.S. 89, 94 (2007). A complaint is not to be dismissed unless it is "frivolous on its face or wholly unsubstantiated." *Washington v. James*, 782 F.2d 1134 (2d Cir. 1989). Submissions by *pro se* litigants "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed.Bureau of Prisons*, 470 F.3d 472, 474 (2d Cir. 2006) (internal citations omitted).

Moreover, it is clear that Appellant, proceeding without counsel, was not aware of the D. Conn. L. Civ. R. 7(c) that requires that a motion for reconsideration be filed within fourteen days, and that his tardiness in filing the motion was caused by his preoccupation with a full-time schedule of classes and studies at the Yale Medical School. Therefore, the district court's denial of the motion on the ground of untimeliness should be reversed.

## IV. DUE PROCESS VIOLATION: VINDICTIVENESS

The Due Process Clause prohibits the prosecutors, U.S. Attorney Sciarrino and Judge Haight from using illegal collections and seizure of real property in retaliation for the plaintiff's successful winning of his case for fraud and predatory lending against the U.Chicago, Wells Fargo Bank and the U.S. DoEd and U.S. Depts. in 1989-1990 before the recently deceased Judge Warren Eginton (Federal Court, Bridgeport, CT).

## V. CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Judge Haight defied the U.S. Second Circuit Court of second ruling, and refused to permit a new complaint, hold a hearing, appoint counsel, or transfer the case to the original Judge Eginton at the Federal Court in Bridgeport, Connecticut.

U.S. Atty Sciarrino has lied to the Court saying that she was present at the first hearing before Judge Eginton. She was not there for the first, lengthy morning hearing, where all the loans were disclosed and then included in the settlement.

Furthermore, all the NDA loans were in default in 1987 and in collection with the other loans. She signed the 1990 contract. (App.27a) Most significant, there was a full judicial pre-trial with counsel in chambers with Judge Eginton, including candid discussion of all of the facts, and issues, arguments, and defenses were laid out and discussed as to all four of the loans, that generated the stipulation for judgement of dismissal with prejudice and entered by agreement of both parties on September 24th 1990 Affdvt. of Ruggiero, para. 8-9 (App.25a).

Furthermore, all the NDA loans were in default in 1987 and in collection with the other loans. She signed the 1990 contract (App.25a). Thus she is in breach of that contract, and is also in violation of a court order, which is worse than breach of settlement. All of the loans are clearly inventoried in the discovery and interrogatories that she sent to the defendant, Rumbin, that were completed by the late Attorney Robert C. Ruggiero, Jr. in a sworn affidavit.

No attempt was undertaken to collect on this $5000 loan until 2011—21 years after the stipulated agreement was signed, the agreement, which remains in force today. Attorney David Leff, who represented Mr. Rumbin (defendant at the time) recalls agreeing to the stipulation agreement only if all loans were included. (App.25a).

In the Amended answer of July 20, 1990, second defense states: "The right of Action set forth in the complaint did accrue within six years next before the commencement of this action." Since all four loans were in default, having been borrowed at the same time, they are all barred by the statute of limitation.

The DoEd and USDT, in violation of the plaintiff's privacy, obtained the plaintiff's Social Security number and other personal information and have used it to take plaintiff's Social Security, Earned Income Tax Credit and eventually real estate.

The U. Chicago pursued a policy of predatory lending targeting poor needy students and exploited the PELL/BEOG grant programs and loan programs to unjustly enrich itself to the detriment of the under-privileged students in the college. These students were fraudulently induced to assume unnecessary loan debt. The plaintiff did not need to take out loans had grant funds been utilized to pay for his education. At no time were any of the programs of forgiveness of loan debt, such as the Borrower Defense to Loan Repayment Forgiveness, ever made known or sought.

The villains in this case are the U. Chicago, U.S. DoEd, USDT, and Wells Fargo Bank that have all profited from these loan and grant programs. These

entities should be required to return the monies that they dishonestly acquired by fraud.

The plaintiff seeks a full return of all monies taken from him, legal costs and damages as well as restoration of his credit and an immediate halt to the offsets, taking tax returns, and real estate.

## VI. The Court's Power to Grant Relief

The FCPA empowers this court to grant any appropriate legal or equitable relief with respect to violations of federal consumer financial law, the refund of monies, paid restitution, disengagement, or compensation for unjust enrichment, and civil money penalties. 12 U.S.C. § 5565(A)(1).



## CONCLUSION

For all of the arguments explicated in the brief and writ of certiorari, the plaintiff asks the U.S. Supreme Court to correct the wrongs committed by the U.S. District Court Judge Charles Haight, Jr., U.S. Attorney Christine Sciarrino, University of Chicago, and Wells Fargo Bank.

The U.S. Court of Appeals for the Second Circuit Court recognized the unfair and unreasonableness that the plaintiff was experiencing with the U.S. District Court in Connecticut. Attorney Anne Detiere, (admitted to the Federal Bar (NY), U. S. Second Circuit Court of Appeals, and the U.S. Supreme Court, who had successfully argued cases before Justice Sonia Sotomayor) had hoped to represent the plaintiff, but

her untimely death on Sept. 21, 2019, left Mr. Rumbin without benefit of legal counsel.

In fact, by his ruling, Judge Haight is allowing U.S. Attorney Sciarrino to continue illegal collection from the plaintiff for the past ten years, accompanied by all its costs, disruption and interference in the plaintiff's life. Unless the U.S. Supreme Court steps forward on behalf of the plaintiff, he shall become homeless and indigent. Meanwhile, the defendants—University of Chicago, Wells Fargo Bank, and the U.S. Department of Education and Treasury—are being unjustly enriched through their fraud and predatory lending practices.

For all the reasons stated herein, the judgment should be reversed, and the case should be heard and settled.

Respectfully submitted to the Court this 28th day of January, 2020.

Respectfully submitted,

IRA GRUDBERG
    COUNSEL OF RECORD
ATTORNEY AT LAW
114 LAUREL CREST ROAD
MADISON, CT 06443
(203) 234-1374
KATIB52612@GMAIL.COM

*COUNSEL FOR PETITIONER*

JANUARY 28, 2020

ADDENDUM                    October 5, 2024

1.  F.H.Cann & Associates,Inc. appeared after the writ of

certiorari was filed to SCOTUS.  F,H.Cann & Associates claims

that the plaintiff, Peter R.Rumbin owes them approximately

$10,000 dollars.(see attached statements).Location: F.H. Cann &

Associates,Inc. 1600 Osgood Street, Suite 3058, North Andover, Mass.
Tel 877-750-9804.
F.H. Cann & Assoc. has not responded to requests for information.

2.Plaintiff is a member of the class action case:  Sweet v. Cardona,

No. 3:19-cv-3674(N.D.Cal.)Settlement became effective on Jan.28,2023.

Ira B. Grudberg,Esq is counsel of record for the class action.

3.  Borrower defense application was denied July 26th, 2024,and
September 5,2024(see attached)
4. US Congresswoman Rosa DeLauro in a recent interview stated

that student loans must be ADJUDICATED in court.

5. President Joe Biden's Executive order for student loans was

recently struck down by the US Supreme Court and his writ of

certiorari to SCOTUS for the student loans was denied. (Plaintiff

also joined this writ). Borrowed defense applications are being

denied.
6. Wells Fargo Bank has been fined millions and billions of

dollars for its misconduct over student loans and other loans

(see attached). It is one of the defendants in this case.

7.The plaintiff is at risk of loss of his real property besides

the continued financial offsets.  US Congresswoman Rosa DeLauro

recently stated that only legislation can stop the seizure of

money and property in student loan-predatory lending cases.

8. No court has held a hearing on this student loan case since

the 1989-1990 stipulated agreement dismissed with prejudice

against the US Depts. of Ed and Treasury. US Depts of Ed and Treasury

et al have never appeared before a fair judge and won any award

34

page 2.            ADDENDUM            October 5,2024

from the plaintiff, Mr. Rumbin, nor have the defendants appealed

or attempted to modify the 1990 agreement. Rather they are

ignoring a judge's court order and seizing plaintiff's money

because the Affordable Care Act revoked due process and require

the plaintiff to file suit. However in this case, there is

already a court order stemming from a suit and hearings,

discovery etc. so the defendants should be barred from their

"offsets--claw backs" according to the US Supreme Court case

ruling Plaut vs Spendthrift Farm.(see writ).

Ira. B. Grudberg,Esq

Date Filed 12/16/2025 6:03 PM
Superior Court - Essex
Docket Number 2577CV00916

EOS CCA
PO BOX 5369
NORWELL MA 02061-5369
FORWARD SERVICE REQUESTED

| Account # : 21-2547049 | Client Reference # : N198905001250601 | Total Due : $16953.43 |

| Do not send cash | NOTE NAME / ADDRESS / |
| Make checks payable to: U.S. Department of Education | PHONE NO. CHANGES ON BACK OF COUPON |

Show your social security number on your check

**Return this portion with your payment**

SEND PAYMENT TO
00-28A

S-ONCCOA21 L-28A (ED001) A-21-2547049-12
P1GKF700204104 I05037
PETER RUMBIN
87 2ND ST
HAMDEN CT 06514-4711

NATIONAL PAYMENT CENTER
PO BOX 105028
ATLANTA GA 30348-5028

4 320443873290 0000004950 00000538        4 320443873290 0003302011 16953430

✂ Detach Upper Portion And Return With Payment ✂        March 30, 2011

EOS CCA
700 LONGWATER DRIVE
PO BOX 5369
NORWELL MA 02061-5369
Toll Free : 1-877-863-9438



**Office Hours :**
Monday - Thursday  7:00AM -  8:00 PM PT
Friday            7:00AM -  5:00 PM PT
Saturday          7:00AM - 12:00 PM PT

## *** FIRST DEMAND NOTICE ***

RE : Your Account with our client ; U.S. DEPARTMENT OF EDUCATION
Client Reference # : N198905001250601
EOS CCA Account # : 21-2547049                        Total Due:  $16953.43

Your account(s) has been placed with us for collection. Please see below for details of your outstanding obligation. This is a demand for payment of your debt.

We urge you to remit payment to the National Payment Center, using the top portion of this coupon.  If you dispute this debt please see the reverse side of this notice for important rights.

| DEBT ID | PRINCIPAL | INTEREST | CHARGES | BALANCE |
|---|---|---|---|---|
| N198905001250601 | $0.00 | $0.00 | $0.00 | $0.00 |
| F198105000054801 | $0.00 | $0.00 | $0.00 | $0.00 |
| G199909004165601 | $2586.30 | $4230.98 | $1659.38 | $8476.66 |
| G199909004165702 | $2586.30 | $4231.07 | $1659.40 | $8476.77 |
|  |  |  | Total Due: | $16953.43 |

NOTE: Your account is accruing interest on a daily basis; please contact our office for an exact payoff amount.

All payments should be mailed to: National Payment Center P.O. Box 105028 Atlanta, GA  30348-5028.

| Please direct disputes or other correspondence regarding your account to: **EOS CCA ED Administrative Unit, PO Box 5369, Norwell, MA 02061-5369** |

This communication is from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose.

| ACCOUNT NO. | PRINCIPAL BAL. | INTEREST |
|---|---|---|
| SXXX-XX-7329 | $5,172.60 | $8,470.81 |
| PENALTY.CHARGES | FEES & COSTS | TOTAL BALANCE |
| $0.00 | $0.00 | $13,643.41 |
| | AMOUNT PAID: | |

**DO NOT SEND CASH
MAKE CHECKS PAYABLE TO:
U.S. DEPARTMENT OF EDUCATION
SHOW YOUR SOCIAL SECURITY NUMBER
ON YOUR CHECK**

## RETURN THIS PORTION WITH YOUR PAYMENT
NOTE NAME/ADDRESS/PHONE NO. CHANGES ON BACK

D019086896

017931  1482  047519
PETER R RUMBIN
87 2ND ST
HAMDEN CT  06514-4711

SEND PAYMENT TO:

NATIONAL PAYMENT CENTER
US DEPARTMENT OF EDUCATION
PO BOX 105028
ATLANTA GA 30348-5028

5 340190868964 0000001158 00000709    5 340190868964 0004092011 13643412

KEEP THIS PORTION FOR YOUR RECORDS

# U.S. DEPARTMENT OF EDUCATION

DATE: APRIL 9, 2011

NOTICE OF UNPAID BALANCE

OUR RECORDS INDICATE THAT THE DEPARTMENT OF EDUCATION RECENTLY CREDITED
TO YOUR ACCOUNT FUNDS TAKEN BY OFFSET OF FEDERAL PAYMENTS OWED TO YOU,
AND THAT, AS OF THE DATE OF THIS NOTICE, YOU STILL OWE THE DEPARTMENT
THE BALANCE SHOWN ABOVE.

PLEASE SEND THAT AMOUNT, ALONG WITH THE DETACHABLE COUPON AT THE TOP OF
THIS NOTICE, TO THE ADDRESS SHOWN ON THAT COUPON.  PLEASE BE SURE TO
WRITE YOUR NAME, ADDRESS AND SOCIAL SECURITY NUMBER ON YOUR CHECK OR
MONEY ORDER.  PLEASE DO NOT SEND CASH.

AVOID OFFSET NEXT YEAR!

YOU MAY BE ABLE TO AVOID OFFSET NEXT YEAR WITHOUT PAYING THE FULL AMOUNT
OF YOUR DEBT.  BY MAKING MONTHLY PAYMENTS YOU MIGHT BECOME ELIGIBLE FOR
THE CONSOLIDATION OR REHABILITATION PROGRAMS, OR YOU MAY BE ABLE TO
NEGOTIATE A LOWER PAYOFF BALANCE.

IF YOU WISH TO MAKE PAYMENT BY CREDIT CARD, IF YOU HAVE ANY QUESTIONS,
OR IF YOU WISH TO ESTABLISH A MONTHLY PAYMENT PLAN, PLEASE CONTACT THE
DEPARTMENT'S CUSTOMER SERVICE CENTER AT 1-800-621-3115.

THIS NOTICE PERTAINS ONLY TO DEBTS OWED TO THE U.S. DEPARTMENT OF EDUCA-
TION FOR WHICH WE HAVE PREVIOUSLY WRITTEN TO YOU AND THAT ARE PAYABLE TO
THE NATIONAL PAYMENT CENTER.  THIS PAYOFF AMOUNT DOES NOT INCLUDE ANY
LOAN OBLIGATION FOR WHICH YOU ARE NOW RECEIVING PAYMENT NOTICES FROM ANY
OTHER PARTY, INCLUDING A SCHOOL, A GUARANTY AGENCY, A COMMERCIAL LENDING
INSTITUTION, OR THE DEPARTMENT'S DIRECT LOAN PROGRAM OFFICES.

*Associates, Inc.*

1699 Osgood St. Suite 20-2/120 • North Andover, MA 01845
Telephone (877) 677-9126

Mon – Thurs 8 A.M. – 8 P.M.
Fri 8 A.M. – 5 P.M.

April 29, 2019

Re    Account#: 1000373071
PETER RUMBIN                          Student loan account held by:
87 2nd St                            U.S. Department of Education
Hamden CT 06514-4711                 Total Due:        $9,276.64
                                     *See Page 2 for Account Details*

Dear PETER RUMBIN,

This notice regarding your defaulted student loan or grant overpayment debt held by the U.S. Department of Education is from F.H. Cann & Associates, Inc. and has been placed with our office for collection. The balance listed above is owed to U.S. Department of Education and the principal continues to accrue interest daily. This balance is effective as of today, April 29, 2019, and may not be an accurate pay-off figure; this balance may increase due to the accrual of interest or assessment of collection costs.

You may not have to repay your loan(s) to the U.S. Department of Education at this time if you are disabled, incarcerated, have declared bankruptcy or if the person to whom this letter is addressed is deceased. If any of these apply, please contact our office and we will assist you in completing the appropriate required paperwork.

Unless you notify this office within 30 days of receiving this notice that you dispute the validity of this debt or any portion thereof, we will assume the debt is valid. If you notify us in writing within 30 days of receiving this notice that you dispute the validity of the debt, or any portion thereof, we will obtain verification of the debt or obtain a copy of a judgment and mail you a copy of such verification or judgment. If you request of this office in writing within 30 days after receipt of this notice, we will provide you with the name and address of the original creditor, if different from the current creditor.

Please contact our office at the phone number above to resolve this matter. You may also visit our website at ttp://edinfo.fhcann.com for more information about your repayment options.

Sincerely,

David Krevitz, Collection Manager

This communication is from a debt collector.  This is an attempt to collect a debt and any information obtained will be used for that purpose.

---

**Make your check or money order payable to U.S. Department of Education
and send to the address below using the enclosed envelope**

DO NOT SEND CHECKS OR CORRESPONDENCE TO: PO Box 505, Linden MI 48451-0505
*** Please detach the lower portion and return with your payment ***

23139ABF4

O Box 505                            Account #: 1000373071
inden MI 48451-0505                  Total Balance owed: $9,276.64
DDRESS SERVICE REQUESTED             Amount Paid: _____

912-ONCANN10-66A-0507/18

April 29, 2019

1200240113952899065144711187—Y23139ABF4 912
TER RUMBIN
2nd St
mden CT 06514-4711



National Payment Center
U.S. Department of Education
PO Box 790336
St Louis MO 63179-0336

410003730716 000000660 00000607    4 410003730716 0004292019 09276644

| FHC # | Client Reference # | Principal | Interest | Costs | Total Balance* |
|-------|--------------------|-----------|----------|-------|----------------|
| 2358263 | 1847089 | 2586.30 | 1590.03 | 748.40 | 4924.73 |
| 2358264 | 1847071 | 0.00 | 0.00 | 0.00 | 0.00 |
| 2358265 | 1847095 | 2586.30 | 1104.26 | 661.35 | 4351.91 |
| 2358266 | 1847081 | 0.00 | 0.00 | 0.00 | 0.00 |

\* Total Balance as of today's date, may increase due to continuing
  accrual of interest and fees.

Y2 3139A8F4

Home > Announcements & Events > Sweet v. Cardona Settlement

## *Sweet v. Cardona* Settlement

Under the settlement in *Sweet v. Cardona*, class members are not required to make payments on their student loans while they have a pending borrower defense application or while their loans are in the process of being discharged.

*Sweet class members who have pending borrower defense applications or have applications that have been approved but have loans that have not been fully discharged are not obligated to repay their loans.*

If you have been notified by the U.S. Department of Education (ED) that you are a member of the *Sweet* class and you receive a payment notice from your servicer, you are not obligated to make payments while your application or loan discharge is pending. The Department is working with servicers to ensure class members with pending applications do not receive payment notices in error.

On June 22, 2022, ED and the plaintiffs reached a settlement in the case titled *Sweet v. Cardona* (formerly *Sweet v DeVos*). The court granted final approval to the settlement as fair, adequate, and reasonable on Nov. 16, 2022. The agreement affects the processing of borrower defense applications filed on or before Nov. 15, 2022. Borrowers whose applications for borrower defense discharges were pending as of June 22, 2022, are "Class Members," while those whose applications were submitted in the period from June 23 to Nov. 15, 2022, are "Post-Class Applicants."

The settlement became effective on Jan. 28, 2023, and ED is starting to implement it, as described below. The settlement is final, though the court granted a temporary stay (delay) of discharges related to three schools until the court of appeals rules on their motion to stay.

### What is this case about?

A lawsuit was filed in a federal district court in California by seven borrower defense applicants who represent, with certain exceptions, all borrowers with pending borrower defense applications filed on or before June 22, 2022. The lawsuit challenges the way ED has dealt with borrower defense applications in the past, including ED's delays in issuing final decisions and ED's denial of certain applications starting in December 2019. The case is now called *Sweet v. Cardona*, No. 3:19-cv-3674 (N.D. Cal.)

On Nov. 16, 2022, after a hearing, the court granted final approval of the settlement reached by ED and the plaintiffs. On Jan. 13, 2023, three schools appealed the district court's approval of the settlement and asked the district court to stay (delay) the settlement while an appeals court considers the appeal. On Feb. 15, 2023, the court held a hearing on the three schools' motion to stay the settlement, and on Feb. 24, the district court denied the schools' request to stay the settlement overall but granted a temporary stay of discharges and discharge requests related to the three schools that filed the motion (Lincoln Technical Institute; American National University; and Everglades College, Inc.) to allow these schools to present a stay motion to the court of appeals. The schools then filed a motion for a stay with the court of appeals on Feb. 27 and, consequently, the temporary stay for the three schools will remain in effect until the court of appeals rules on the motion before it.

### What are the terms of the settlement for borrowers who applied for borrower defense relief on or before June 22, 2022?

In the settlement, ED agrees to resolve the borrower defense applications that wer∙ following terms:

- If the borrower defense application related to federal student loans taken ou list of schools attached to the settlement agreement as Exhibit C, the borrowe Settlement Relief means that the federal student loan(s) associated with the l discharged, ED will refund any amounts paid to ED on those loans, and the cr deleted from the borrower's credit report.

- Within 90 days of the court's final approval of the settlement agreement, ED will receive Full Settlement Relief as stated above and that relief will be prov date of the settlement agreement. Until this relief is provided, ED won't take

- If the borrower's loans aren't associated with a school on the list, the borrowe application according to the following schedule:

Hi there! I'm Aidan®, the financial aid virtual assistant. How can I help you today?

Help with the FAFSA® form

Login (FSA ID) issues

I want my loan and grant info

I have a different question

*Sweet v. Cardona* Loan Discharge Application Decision Schedule



| Application Submitted | ED Decision |
|---|---|
| Between Jan. 1, 2015, and Dec. 31, 2017 | No later than July 28, 2023 |
| Between Jan. 1, 2018 and Dec. 31, 2018 | No later than Jan. 28, 2024 |
| Between Jan. 1, 2019, and Dec. 31, 2019 | No later than July 28, 2024 |
| Between Jan. 1, 2020, and Dec. 31, 2020 | No later than Jan. 28, 2025 |
| Between Jan. 1, 2021, and June 22, 2022 | No later than July 28, 2025 |

- If ED doesn't make a decision on an application within the timelines outlined above, the borrower will receive Full Settlement Relief. If a borrower submitted multiple applications, ED will use the earliest submitted application date.

**ED's Review Process**

ED will use a streamlined review process to make decisions on these applications. ED will review these applications using the 2016 Borrower Defense Regulation but will not require evidence outside of the written application, require proof of reliance, or apply any statute of limitations. Rather, ED will determine whether the application states a claim that, if presumed to be true, would assert a valid basis for borrower defense under the applicable regulation. Borrowers whose applications are approved under the procedures above will receive Full Settlement Relief.

**If Your Application Isn't Approved Under the Streamlined Review Process**

ED won't deny an application without first providing instructions on what is required for a successful application and giving the borrower the opportunity to resubmit the application. If the borrower chooses to resubmit the application, it must be submitted within six months after receiving those instructions. The instructions will explain that if the application is not resubmitted within the six-month period, the application will be considered denied.

If the borrower chooses to resubmit their application within the six-month time period after receiving the instructions, ED will issue a final decision no later than six months after receiving the resubmitted application.

- For any borrower who received a notice from ED in December 2019 or later informing them that their borrower defense application was denied, that denial has been voided and ED will review the application pursuant to the terms described above.

## What are the terms of the settlement for borrowers who applied for borrower defense relief after June 22, 2022, but before final approval of the settlement?

For post-class applicants (borrowers who submitted a borrower defense application in the period from June 23, 2022, to Nov. 15, 2022), ED will review these applications using the 2016 Borrower Defense Regulation and will issue a decision on the application no later than Jan. 28, 2026.

If ED doesn't issue a decision within this time period, the borrowers will receive Full Settlement Relief.

## What if the loan is in default?

If the loan for which a Class Member or Post-Class Applicant has submitted a borrower defense application is in default, ED will not take action to collect the debt—such as by garnishing wages or taking por|   Hi there! I'm Aidan©, the financial
is pending or while the borrower is waiting to receive any relief owed under the s|   aid virtual assistant. How can I
help you today?

## What happens next?

ED has already reopened the previously denied cases that require streamlined rev
You'll receive a decision based on the schedule noted above.

Additionally, in accordance with the court's order issued on Feb. 24, 2023 (describi
loans associated with Lincoln Technical Institute; American National University; a
appeals rules on the stay motion.

## *Sweet v. Cardona* Settlement Quarterly Reports

The settlement requires that we submit quarterly reports documenting our progress toward fulfilling our obligations un
the settlement, and that we post them publicly.



- May 30, 2023, Quarterly Report*

- August 28, 2023, Quarterly Report*

- November 27, 2023, Quarterly Report*

- February 26, 2024, Quarterly Report*

- May 28, 2024, Quarterly Report*

- August 26, 2024, Quarterly Report*

*ED strives to make all content accessible to everyone. While this document does not currently meet the standards of Section 508 of the Rehabilitation Act of 1973, as amended, we are working to create accessible versions. For immediate assistance on receiving a 508-compliant document, please send us a written request, including title of document, date of request, and your email address, to:*

*Federal Student Aid Information Center*
*P.O. Box 84*
*Washington, D.C. 20044*

## Can I get more information?

Check back here periodically for updated information about the settlement.

- Review the settlement.*

- Review the complaint.*

- Review the amended complaint.*

- Review the preliminary approval order.*

- Review the order granting final approval.*

- Review the order denying the motion to stay.*

Learn more about this lawsuit and the proposed settlement and find contact information for the lawyers who brought the lawsuit ☑.

*ED strives to make all content accessible to everyone. While this document does not currently meet the standards of Section 508 of the Rehabilitation Act of 1973, as amended, we are working to create accessible versions. For immediate assistance on receiving a 508-compliant document, please send us a written request, including title of document, date of request, and your email address, to:*

*Federal Student Aid Information Center*
*P.O. Box 84*
*Washington, D.C. 20044*

## I am not a class member. Should I apply for borrower defense?

The *Sweet* settlement only impacts individuals who applied for borrower defense discharge on or before Nov. 15, 2022. If you didn't apply on or before Nov. 15, 2022, learn more about borrower defense and w

Was this page helpful?* 👍 👎

Hi there! I'm Aidan©, the financial aid virtual assistant. How can I help you today?



# Wells Fargo fined $3.6M over student loan practices

**Charisse Jones** USA TODAY

Published 5:15 p.m. ET Aug. 22, 2016 | Updated 6:18 p.m. ET Aug. 22, 2016

Wells Fargo must reform its practices and pay a $3.6 million fine for actions that federal consumer protection officials say misled student loan borrowers and resulted in some paying unnecessary fees.

In the order filed Monday leveling the penalty, the Consumer Financial Protection Bureau said the bank acted illegally, charging on-time payers with late fees, failed to inform borrowers of steps they could take to minimize fees and left credit report errors uncorrected.

"Wells Fargo hit borrowers with illegal fees and deprived others of critical information needed to effectively manage their student loan accounts," bureau Director Richard Cordray said in a statement. "Consumers should be able to rely on their servicer to process and credit payments correctly and to provide accurate and timely information."

College debt, no degree means world of financial hurt

According to the bureau, Wells Fargo left borrowers in the dark about how it divided single payments between their multiple loans, and did not make borrowers aware that they could decide how payments were to be allocated, which led to the possibility of unnecessary late fees. Billing statements did not make it clear that partial payment could be counted toward paying down student debt. The bank illegally tagged some borrowers with late fees though payments had been made as scheduled, and when it gave wrong information to credit reporting entities, it did not correct them.

**Pursue your education:** See the best student loans

But Wells Fargo said in a statement that it has already overhauled the problematic processes cited in the order and, while disagreeing with the charges, that it will address the bureau's

concerns to put the matter behind it.

"Today's consent order with the CFPB resolves three areas of concern cited by the bureau related to legacy payment procedures that were retired or improved many years ago, and addresses the impact to a small number of customers," the statement says.

According to the order, Wells Fargo must pay at least $410,000 to reimburse borrowers for wrongfully charged late fees. The bank must also correct credit report errors, do a better job of explaining how consumers can allocate their payments, and use partial payments to pay what is due on as many loans as possible.

The actions taken against Wells Fargo are designed to put a dent in the more than $110 billion in student loans that are in default, the bureau says. Private loans, like those provided by Wells Fargo, are roughly $100 billion of all outstanding student loan debt, and the bureau says that many of those consumers have also borrowed from the federal government to pay for schooling.



**PRESS RELEASE**

# Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization

Friday, February 21, 2020

**For Immediate Release**

Office of Public Affairs

### $3 Billion Payment Result of Deferred Prosecution Agreement in Criminal Matter, Settlement of Civil Claims under FIRREA and Resolution of SEC Proceedings

Wells Fargo & Company and its subsidiary, Wells Fargo Bank, N.A., have agreed to pay $3 billion to resolve their potential criminal and civil liability stemming from a practice between 2002 and 2016 of pressuring employees to meet unrealistic sales goals that led thousands of employees to provide millions of accounts or products to customers under false pretenses or without consent, often by creating false records or misusing customers' identities, the Department of Justice announced today.

As part of the agreements with the United States Attorney's Offices for the Central District of California and the Western District of North Carolina, the Commercial Litigation Branch of the Civil Division, and the Securities and Exchange Commission, Wells Fargo admitted that it collected millions of dollars in fees and interest to which the Company was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information, including customers' means of identification.

"When companies cheat to compete, they harm customers and other competitors," said Deputy Assistant Attorney General Michael D. Granston of the Department of Justice's Civil Division. "This settlement holds Wells Fargo accountable for tolerating fraudulent conduct that is remarkable both for its duration and scope, and for its blatant disregard of customer's private information. The Civil Division will continue to use all available tools to protect the American public from fraud and abuse, including misconduct by or against their financial institutions."

"Our settlement with Wells Fargo, and the $3 billion monetary penalty imposed on the bank, go far beyond 'the cost of doing business.' They are appropriate given the staggering size, scope and duration of Wells Fargo's illicit conduct, which spanned well over a decade," said U.S. Attorney Andrew Murray for the Western District of North Carolina. "When a reputable institution like Wells Fargo caves to the pernicious forces of greed, and puts its own interests ahead of those of the customers it claims to serve, my office will not sit idle. Today's announcement should serve as a stark reminder that no institution is too big, too powerful, or too well-known to be held accountable and face enforcement action for its wrongdoings."

"This case illustrates a complete failure of leadership at multiple levels within the Bank. Simply put, Wells Fargo traded its hard-earned reputation for short-term profits, and harmed untold numbers of customers along the way," said U.S. Attorney Nick Hanna for the Central District of California. "We are hopeful that this $3 billion penalty, along with the personnel and structural changes at the Bank, will ensure that such conduct will not reoccur."

"Our office is committed to bringing to justice those who deliberately falsify and fabricate bank records in order to deceive regulators and the public," said Inspector General Mark Bialek of the Board of Governors of the Federal Reserve System and Bureau of Consumer Financial Protection. "I commend our agent and our law enforcement partners for their hard work and persistence that led to today's announcement."

"Today's multi-billion-dollar penalty holds Wells Fargo accountable for its unlawful sales practices and pressure tactics in which it deceived millions of clients, thus causing substantial hardship for the very individuals who placed their trust in the institution," said Inspector General Jay N. Lerner Federal Deposit Insurance Corporation. "The FDIC Office of Inspector General is committed to working with our law enforcement partners in order to investigate such financial crimes that harm customers and investors, and undermine the integrity of the banking sector."

The criminal investigation into false bank records and identity theft is being resolved with a deferred prosecution agreement in which Wells Fargo will not be prosecuted during the three-year term of the agreement if it abides by certain conditions, including continuing to cooperate with further government investigations. Wells Fargo also entered a civil settlement agreement under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) based on Wells Fargo's creation of false bank records. FIRREA authorizes the federal government to seek civil penalties against financial institutions that violate various predicate criminal offenses, including false bank records. Wells Fargo also agreed to the SEC instituting a cease-and-desist proceeding finding violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. The $3 billion payment resolves all three matters, and includes a $500 million civil penalty to be distributed by the SEC to investors.

The 16-page statement of facts accompanying the deferred prosecution agreement and civil settlement agreement outlines a course of conduct over 15 years at Well Fargo's Community Bank, which was then the largest operating segment of Wells Fargo, consistently generating more than half of the company's revenue. The statement of facts outlines top Community Bank leaders' knowledge of the conduct. As part of the statement of facts, Wells Fargo admitted the following:

Beginning in 1998, Wells Fargo increased its focus on sales volume and reliance on annual sales growth. A core part of this sales model was the "cross-sell strategy" to sell existing customers additional financial products. It was "the foundation of our business model," according to Wells Fargo. In its 2012 Vision and Values statement, Wells Fargo stated: "We start with what the customer needs – not with what we want to sell them."

But, in contrast to Wells Fargo's public statements and disclosures about needs-based selling, the Community Bank implemented a volume-based sales model in which employees were directed and pressured to sell large volumes of products to existing customers, often with little regard to actual customer need or expected use. The Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in unlawful conduct – including fraud, identity theft and the falsification of bank records – and unethical practices to sell product of no or little value to the customer.

Many of these practices were referred to within Wells Fargo as "gaming." Gaming strategies varied widely, but included using existing customers' identities – without their consent – to open checking and savings, debit card, credit card, bill pay and global remittance accounts. From 2002 to 2016, gaming practices included forging customer signatures to open accounts without authorization, creating PINs to activate unauthorized debit cards, moving money from millions of customer accounts to unauthorized accounts in a practice known internally as "simulated funding," opening credit cards and bill pay products without authorization, altering customers' true contact information to prevent customers from learning of unauthorized accounts and

prevent Wells Fargo employees from reaching customers to conduct customer satisfaction surveys, and encouraging customers to open accounts they neither wanted or needed.

The top managers of the Community Bank were aware of the unlawful and unethical gaming practices as early as 2002, and they knew that the conduct was increasing due to onerous sales goals and pressure from management to meet these goals. One internal investigator in 2004 called the problem a "growing plague." The following year, another internal investigator said the problem was "spiraling out of control." Even after senior managers in the Community Bank directly called into question the implementation of the cross-sell strategy, Community Bank senior leadership refused to alter the sales model, which contained unrealistic sales goals and a focus on low-quality secondary accounts.

Despite knowledge of the illegal sales practices, Community Bank senior leadership failed to take sufficient action to prevent and reduce the incidence of such practices. Senior leadership of the Community Bank minimized the problems to Wells Fargo management and its board of directors, by casting the problem as driven by individual misconduct instead of the sales model itself. Community Bank senior leadership viewed negative sales quality and integrity as a necessary byproduct of the increased sales and as merely the cost of doing business.

* * *

The government's decision to enter into the deferred prosecution agreement and civil settlement took into account a number of factors, including Wells Fargo's extensive cooperation and substantial assistance with the government's investigations; Wells Fargo's admission of wrongdoing; its continued cooperation in the investigations; its prior settlements in a series of regulatory and civil actions; and remedial actions, including significant changes in Wells Fargo's management and its board of directors, an enhanced compliance program, and significant work to identify and compensate customers who may have been victims. The deferred prosecution agreement will be in effect for three years.

The global settlement also reflects coordination between the Department of Justice and the SEC to ensure a resolution that appropriately addresses the severity of the defendants' conduct while avoiding the imposition of fines and penalties that are unnecessarily duplicative.

The deferred prosecution agreement was handled by the United States Attorney's Offices in Los Angeles and Charlotte, with investigative support from the Federal Bureau of Investigation, the Federal Deposit Insurance Corporation - Office of Inspector General, the Federal Housing Finance Agency - Office of Inspector General, the Office of Inspector General for the Board of Governors of the Federal Reserve System and Consumer Financial Protection Bureau, and the United States Postal Inspection Service.

The civil settlement agreement was the result of a coordinated effort between the Civil Division's Commercial Litigation Branch and the U.S. Attorney's Office in Los Angeles.

# CFPB Orders Wells Fargo to Pay $3.7 Billion for Widespread Mismanagement of Auto Loans, Mortgages, and Deposit Accounts

**C** consumerfinance.gov/about-us/newsroom/cfpb-orders-wells-fargo-to-pay-37-billion-for-widespread-mismanagement-of-auto-loans-mortgages-and-deposit-accounts

**WASHINGTON, D.C.** -- The Consumer Financial Protection Bureau (CFPB) is ordering Wells Fargo Bank to pay more than $2 billion in redress to consumers and a $1.7 billion civil penalty for legal violations across several of its largest product lines. The bank's illegal conduct led to billions of dollars in financial harm to its customers and, for thousands of customers, the loss of their vehicles and homes. Consumers were illegally assessed fees and interest charges on auto and mortgage loans, had their cars wrongly repossessed, and had payments to auto and mortgage loans misapplied by the bank. Wells Fargo also charged consumers unlawful surprise overdraft fees and applied other incorrect charges to checking and savings accounts. Under the terms of the order, Wells Fargo will pay redress to the over 16 million affected consumer accounts, and pay a $1.7 billion fine, which will go to the CFPB's Civil Penalty Fund, where it will be used to provide relief to victims of consumer financial law violations.

"Wells Fargo's rinse-repeat cycle of violating the law has harmed millions of American families," said CFPB Director Rohit Chopra. "The CFPB is ordering Wells Fargo to refund billions of dollars to consumers across the country. This is an important initial step for accountability and long-term reform of this repeat offender."

Wells Fargo (NYSE: WFC) is one of the nation's largest banks serving households across the country. It offers a variety of consumer financial services, including mortgages, auto loans, savings and checking accounts, and online banking services.

According to today's enforcement action, Wells Fargo harmed millions of consumers over a period of several years, with violations across many of the bank's largest product lines. The CFPB's specific findings include that Wells Fargo:

- **Unlawfully repossessed vehicles and bungled borrower accounts:** Wells Fargo had systematic failures in its servicing of automobile loans that resulted in $1.3 billion in harm across more than 11 million accounts. The bank incorrectly applied borrowers' payments, improperly charged fees and interest, and wrongfully repossessed borrowers' vehicles. In addition, the bank failed to ensure that borrowers received a refund for certain fees on add-on products when a loan ended early.

- **Improperly denied mortgage modifications:** During at least a seven-year period, the bank improperly denied thousands of mortgage loan modifications, which in some cases led to Wells Fargo customers losing their homes to wrongful foreclosures. The bank was aware of the problem for years before it ultimately addressed the issue.
- **Illegally charged surprise overdraft fees:** For years, Wells Fargo unfairly charged surprise overdraft fees - fees charged even though consumers had enough money in their account to cover the transaction at the time the bank authorized it - on debit card transactions and ATM withdrawals. As early as 2015, the CFPB, as well as other federal regulators, including the Federal Reserve, began cautioning financial institutions against this practice, known as authorized positive fees.
- **Unlawfully froze consumer accounts and mispresented fee waivers:** The bank froze more than 1 million consumer accounts based on a faulty automated filter's determination that there may have been a fraudulent deposit, even when it could have taken other actions that would have not harmed customers. Customers affected by these account freezes were unable to access any of their money in accounts at the bank for an average of at least two weeks. The bank also made deceptive claims as to the availability of waivers for a monthly service fee.

Wells Fargo is a repeat offender that has been the subject of multiple enforcement actions by the CFPB and other regulators for violations across its lines of business, including faulty student loan servicing, mortgage kickbacks, fake accounts, and harmful auto loan practices.

## Enforcement action

Under the Consumer Financial Protection Act, the CFPB has the authority to take action against institutions violating federal consumer financial laws, including by engaging in unfair, deceptive, or abusive acts or practices. The CFPB's investigation found that Wells Fargo violated the Act's prohibition on unfair and deceptive acts and practices.

The CFPB order requires Wells Fargo to:

- **Provide more than $2 billion in redress to consumers:** Wells Fargo will be required to pay redress totaling more than $2 billion to harmed customers. These payments represent refunds of wrongful fees and other charges and compensation for a variety of harms such as frozen bank accounts, illegally repossessed vehicles, and wrongfully foreclosed homes. Specifically, Wells Fargo will have to pay:
  - More than $1.3 billion in consumer redress for affected auto lending accounts.
  - More than $500 million in consumer redress for affected deposit accounts, including $205 million for illegal surprise overdraft fees.
  - Nearly $200 million in consumer redress for affected mortgage servicing accounts.

- **Stop charging surprise overdraft fees:** Wells Fargo may not charge overdraft fees for deposit accounts when the consumer had available funds at the time of a purchase or other debit transaction, but then subsequently had a negative balance once the transaction settled. Surprise overdraft fees have been a recurring issue for consumers who can neither reasonably anticipate nor take steps to avoid them.
- **Ensure auto loan borrowers receive refunds for certain add-on fees:** Wells Fargo must ensure that the unused portion of GAP contracts, a type of debt cancellation contract that covers the remaining amount of the borrower's auto loan in the case of a major accident or theft, is refunded to the borrower when a loan is paid off or otherwise terminates early.
- **Pay $1.7 billion in penalties:** Wells Fargo will pay a $1.7 billion penalty to the CFPB, which will be deposited into the CFPB's victims relief fund.

Read today's order. 🗎

Read CFPB Director Chopra's remarks on a press call announcing the action.

The CFPB wishes to thank members of the public who submitted complaints through the CFPB's complaint system across Wells Fargo product lines. These complaints aided in the detection of some of the illegal activity uncovered in the CFPB's investigation.

The CFPB is also grateful for the cooperation and the substantial work performed by the Office of the Comptroller of the Currency, whose efforts have contributed to the significant remediation received by consumers harmed by the bank's illegal activity, and the Federal Reserve Board of Governors.

Consumers who are experiencing ongoing problems with Wells Fargo, or other financial providers, can submit complaints by visiting the CFPB's website or by calling (855) 411-CFPB (2372). The Bureau also has resources for consumers about mortgage servicing, auto loans, and deposit accounts:

Mortgage servicing: https://www.consumerfinance.gov/consumer-tools/mortgages/

Auto loans: https://www.consumerfinance.gov/consumer-tools/auto-loans/

Deposit Accounts: https://www.consumerfinance.gov/consumer-tools/bank-accounts/

Wells Fargo employees who are aware of other illegal activity are encouraged to send information about what they know to whistleblower@cfpb.gov.

---

*The Consumer Financial Protection Bureau is a 21st century agency that implements and enforces Federal consumer financial law and ensures that markets for consumer financial products are fair, transparent, and competitive. For more information, visit*



**MONEY**                                    **Wells Fargo**    **Add Topic**

# Wells Fargo fined $3.6M over student loan practices

**Charisse Jones** USA TODAY
Published 5:15 p.m. ET Aug. 22, 2016 | Updated 6:18 p.m. ET Aug. 22, 2016

Wells Fargo must reform its practices and pay a $3.6 million fine for actions that federal consumer protection officials say misled student loan borrowers and resulted in some paying unnecessary fees.

In the order filed Monday leveling the penalty, the Consumer Financial Protection Bureau said the bank acted illegally, charging on-time payers with late fees, failed to inform borrowers of steps they could take to minimize fees and left credit report errors uncorrected.

"Wells Fargo hit borrowers with illegal fees and deprived others of critical information needed to effectively manage their student loan accounts," bureau Director Richard Cordray said in a statement. "Consumers should be able to rely on their servicer to process and credit payments correctly and to provide accurate and timely information."

College debt, no degree means world of financial hurt

According to the bureau, Wells Fargo left borrowers in the dark about how it divided single payments between their multiple loans, and did not make borrowers aware that they could decide how payments were to be allocated, which led to the possibility of unnecessary late fees. Billing statements did not make it clear that partial payment could be counted toward paying down student debt. The bank illegally tagged some borrowers with late fees though payments had been made as scheduled, and when it gave wrong information to credit reporting entities, it did not correct them.

**Pursue your education:** See the best student loans

But Wells Fargo said in a statement that it has already overhauled the problematic processes cited in the order and, while disagreeing with the charges, that it will address the bureau's

concerns to put the matter behind it.

"Today's consent order with the CFPB resolves three areas of concern cited by the bureau related to legacy payment procedures that were retired or improved many years ago, and addresses the impact to a small number of customers," the statement says.

According to the order, Wells Fargo must pay at least $410,000 to reimburse borrowers for wrongfully charged late fees. The bank must also correct credit report errors, do a better job of explaining how consumers can allocate their payments, and use partial payments to pay what is due on as many loans as possible.

The actions taken against Wells Fargo are designed to put a dent in the more than $110 billion in student loans that are in default, the bureau says. Private loans, like those provided by Wells Fargo, are roughly $100 billion of all outstanding student loan debt, and the bureau says that many of those consumers have also borrowed from the federal government to pay for schooling.



PRESS RELEASE

# Wells Fargo Agrees to Pay $3 Billion to Resolve Criminal and Civil Investigations into Sales Practices Involving the Opening of Millions of Accounts without Customer Authorization

Friday, February 21, 2020

**For Immediate Release**

Office of Public Affairs

### $3 Billion Payment Result of Deferred Prosecution Agreement in Criminal Matter, Settlement of Civil Claims under FIRREA and Resolution of SEC Proceedings

Wells Fargo & Company and its subsidiary, Wells Fargo Bank, N.A., have agreed to pay $3 billion to resolve their potential criminal and civil liability stemming from a practice between 2002 and 2016 of pressuring employees to meet unrealistic sales goals that led thousands of employees to provide millions of accounts or products to customers under false pretenses or without consent, often by creating false records or misusing customers' identities, the Department of Justice announced today.

As part of the agreements with the United States Attorney's Offices for the Central District of California and the Western District of North Carolina, the Commercial Litigation Branch of the Civil Division, and the Securities and Exchange Commission, Wells Fargo admitted that it collected millions of dollars in fees and interest to which the Company was not entitled, harmed the credit ratings of certain customers, and unlawfully misused customers' sensitive personal information, including customers' means of identification.

"When companies cheat to compete, they harm customers and other competitors," said Deputy Assistant Attorney General Michael D. Granston of the Department of Justice's Civil Division. "This settlement holds Wells Fargo accountable for tolerating fraudulent conduct that is remarkable both for its duration and scope, and for its blatant disregard of customer's private information. The Civil Division will continue to use all available tools to protect the American public from fraud and abuse, including misconduct by or against their financial institutions."

"Our settlement with Wells Fargo, and the $3 billion monetary penalty imposed on the bank, go far beyond 'the cost of doing business.' They are appropriate given the staggering size, scope and duration of Wells Fargo's illicit conduct, which spanned well over a decade," said U.S. Attorney Andrew Murray for the Western District of North Carolina. "When a reputable institution like Wells Fargo caves to the pernicious forces of greed, and puts its own interests ahead of those of the customers it claims to serve, my office will not sit idle. Today's announcement should serve as a stark reminder that no institution is too big, too powerful, or too well-known to be held accountable and face enforcement action for its wrongdoings."

"This case illustrates a complete failure of leadership at multiple levels within the Bank. Simply put, Wells Fargo traded its hard-earned reputation for short-term profits, and harmed untold numbers of customers along the way," said U.S. Attorney Nick Hanna for the Central District of California. "We are hopeful that this $3 billion penalty, along with the personnel and structural changes at the Bank, will ensure that such conduct will not reoccur."

"Our office is committed to bringing to justice those who deliberately falsify and fabricate bank records in order to deceive regulators and the public," said Inspector General Mark Bialek of the Board of Governors of the Federal Reserve System and Bureau of Consumer Financial Protection. "I commend our agent and our law enforcement partners for their hard work and persistence that led to today's announcement."

"Today's multi-billion-dollar penalty holds Wells Fargo accountable for its unlawful sales practices and pressure tactics in which it deceived millions of clients, thus causing substantial hardship for the very individuals who placed their trust in the institution," said Inspector General Jay N. Lerner Federal Deposit Insurance Corporation. "The FDIC Office of Inspector General is committed to working with our law enforcement partners in order to investigate such financial crimes that harm customers and investors, and undermine the integrity of the banking sector."

The criminal investigation into false bank records and identity theft is being resolved with a deferred prosecution agreement in which Wells Fargo will not be prosecuted during the three-year term of the agreement if it abides by certain conditions, including continuing to cooperate with further government investigations. Wells Fargo also entered a civil settlement agreement under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) based on Wells Fargo's creation of false bank records. FIRREA authorizes the federal government to seek civil penalties against financial institutions that violate various predicate criminal offenses, including false bank records. Wells Fargo also agreed to the SEC instituting a cease-and-desist proceeding finding violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. The $3 billion payment resolves all three matters, and includes a $500 million civil penalty to be distributed by the SEC to investors.

The 16-page statement of facts accompanying the deferred prosecution agreement and civil settlement agreement outlines a course of conduct over 15 years at Well Fargo's Community Bank, which was then the largest operating segment of Wells Fargo, consistently generating more than half of the company's revenue. The statement of facts outlines top Community Bank leaders' knowledge of the conduct. As part of the statement of facts, Wells Fargo admitted the following:

Beginning in 1998, Wells Fargo increased its focus on sales volume and reliance on annual sales growth. A core part of this sales model was the "cross-sell strategy" to sell existing customers additional financial products. It was "the foundation of our business model," according to Wells Fargo. In its 2012 Vision and Values statement, Wells Fargo stated: "We start with what the customer needs – not with what we want to sell them."

But, in contrast to Wells Fargo's public statements and disclosures about needs-based selling, the Community Bank implemented a volume-based sales model in which employees were directed and pressured to sell large volumes of products to existing customers, often with little regard to actual customer need or expected use. The Community Bank's onerous sales goals and accompanying management pressure led thousands of its employees to engage in unlawful conduct – including fraud, identity theft and the falsification of bank records – and unethical practices to sell product of no or little value to the customer.

Many of these practices were referred to within Wells Fargo as "gaming." Gaming strategies varied widely, but included using existing customers' identities – without their consent – to open checking and savings, debit card, credit card, bill pay and global remittance accounts. From 2002 to 2016, gaming practices included forging customer signatures to open accounts without authorization, creating PINs to activate unauthorized debit cards, moving money from millions of customer accounts to unauthorized accounts in a practice known internally as "simulated funding," opening credit cards and bill pay products without authorization, altering customers' true contact information to prevent customers from learning of unauthorized accounts and

prevent Wells Fargo employees from reaching customers to conduct customer satisfaction surveys, and encouraging customers to open accounts they neither wanted or needed.

The top managers of the Community Bank were aware of the unlawful and unethical gaming practices as early as 2002, and they knew that the conduct was increasing due to onerous sales goals and pressure from management to meet these goals. One internal investigator in 2004 called the problem a "growing plague." The following year, another internal investigator said the problem was "spiraling out of control." Even after senior managers in the Community Bank directly called into question the implementation of the cross-sell strategy, Community Bank senior leadership refused to alter the sales model, which contained unrealistic sales goals and a focus on low-quality secondary accounts.

Despite knowledge of the illegal sales practices, Community Bank senior leadership failed to take sufficient action to prevent and reduce the incidence of such practices. Senior leadership of the Community Bank minimized the problems to Wells Fargo management and its board of directors, by casting the problem as driven by individual misconduct instead of the sales model itself. Community Bank senior leadership viewed negative sales quality and integrity as a necessary byproduct of the increased sales and as merely the cost of doing business.

* * *

The government's decision to enter into the deferred prosecution agreement and civil settlement took into account a number of factors, including Wells Fargo's extensive cooperation and substantial assistance with the government's investigations; Wells Fargo's admission of wrongdoing; its continued cooperation in the investigations; its prior settlements in a series of regulatory and civil actions; and remedial actions, including significant changes in Wells Fargo's management and its board of directors, an enhanced compliance program, and significant work to identify and compensate customers who may have been victims. The deferred prosecution agreement will be in effect for three years.

The global settlement also reflects coordination between the Department of Justice and the SEC to ensure a resolution that appropriately addresses the severity of the defendants' conduct while avoiding the imposition of fines and penalties that are unnecessarily duplicative.

The deferred prosecution agreement was handled by the United States Attorney's Offices in Los Angeles and Charlotte, with investigative support from the Federal Bureau of Investigation, the Federal Deposit Insurance Corporation - Office of Inspector General, the Federal Housing Finance Agency - Office of Inspector General, the Office of Inspector General for the Board of Governors of the Federal Reserve System and Consumer Financial Protection Bureau, and the United States Postal Inspection Service.

The civil settlement agreement was the result of a coordinated effort between the Civil Division's Commercial Litigation Branch and the U.S. Attorney's Office in Los Angeles.

# CFPB Orders Wells Fargo to Pay $3.7 Billion for Widespread Mismanagement of Auto Loans, Mortgages, and Deposit Accounts

C consumerfinance.gov/about-us/newsroom/cfpb-orders-wells-fargo-to-pay-37-billion-for-widespread-mismanagement-of-auto-loans-mortgages-and-deposit-accounts

**WASHINGTON, D.C.** – The Consumer Financial Protection Bureau (CFPB) is ordering Wells Fargo Bank to pay more than $2 billion in redress to consumers and a $1.7 billion civil penalty for legal violations across several of its largest product lines. The bank's illegal conduct led to billions of dollars in financial harm to its customers and, for thousands of customers, the loss of their vehicles and homes. Consumers were illegally assessed fees and interest charges on auto and mortgage loans, had their cars wrongly repossessed, and had payments to auto and mortgage loans misapplied by the bank. Wells Fargo also charged consumers unlawful surprise overdraft fees and applied other incorrect charges to checking and savings accounts. Under the terms of the order, Wells Fargo will pay redress to the over 16 million affected consumer accounts, and pay a $1.7 billion fine, which will go to the CFPB's Civil Penalty Fund, where it will be used to provide relief to victims of consumer financial law violations.

"Wells Fargo's rinse-repeat cycle of violating the law has harmed millions of American families," said CFPB Director Rohit Chopra. "The CFPB is ordering Wells Fargo to refund billions of dollars to consumers across the country. This is an important initial step for accountability and long-term reform of this repeat offender."

Wells Fargo (NYSE: WFC) is one of the nation's largest banks serving households across the country. It offers a variety of consumer financial services, including mortgages, auto loans, savings and checking accounts, and online banking services.

According to today's enforcement action, Wells Fargo harmed millions of consumers over a period of several years, with violations across many of the bank's largest product lines. The CFPB's specific findings include that Wells Fargo:

- **Unlawfully repossessed vehicles and bungled borrower accounts:** Wells Fargo had systematic failures in its servicing of automobile loans that resulted in $1.3 billion in harm across more than 11 million accounts. The bank incorrectly applied borrowers' payments, improperly charged fees and interest, and wrongfully repossessed borrowers' vehicles. In addition, the bank failed to ensure that borrowers received a refund for certain fees on add-on products when a loan ended early.

- **Improperly denied mortgage modifications:** During at least a seven-year period, the bank improperly denied thousands of mortgage loan modifications, which in some cases led to Wells Fargo customers losing their homes to wrongful foreclosures. The bank was aware of the problem for years before it ultimately addressed the issue.
- **Illegally charged surprise overdraft fees:** For years, Wells Fargo unfairly charged surprise overdraft fees – fees charged even though consumers had enough money in their account to cover the transaction at the time the bank authorized it – on debit card transactions and ATM withdrawals. As early as 2015, the CFPB, as well as other federal regulators, including the Federal Reserve, began cautioning financial institutions against this practice, known as authorized positive fees.
- **Unlawfully froze consumer accounts and mispresented fee waivers:** The bank froze more than 1 million consumer accounts based on a faulty automated filter's determination that there may have been a fraudulent deposit, even when it could have taken other actions that would have not harmed customers. Customers affected by these account freezes were unable to access any of their money in accounts at the bank for an average of at least two weeks. The bank also made deceptive claims as to the availability of waivers for a monthly service fee.

Wells Fargo is a repeat offender that has been the subject of multiple enforcement actions by the CFPB and other regulators for violations across its lines of business, including faulty student loan servicing, mortgage kickbacks, fake accounts, and harmful auto loan practices.

## Enforcement action

Under the Consumer Financial Protection Act, the CFPB has the authority to take action against institutions violating federal consumer financial laws, including by engaging in unfair, deceptive, or abusive acts or practices. The CFPB's investigation found that Wells Fargo violated the Act's prohibition on unfair and deceptive acts and practices.

The CFPB order requires Wells Fargo to:

- **Provide more than $2 billion in redress to consumers:** Wells Fargo will be required to pay redress totaling more than $2 billion to harmed customers. These payments represent refunds of wrongful fees and other charges and compensation for a variety of harms such as frozen bank accounts, illegally repossessed vehicles, and wrongfully foreclosed homes. Specifically, Wells Fargo will have to pay:
  - More than $1.3 billion in consumer redress for affected auto lending accounts.
  - More than $500 million in consumer redress for affected deposit accounts, including $205 million for illegal surprise overdraft fees.
  - Nearly $200 million in consumer redress for affected mortgage servicing accounts.

Date Filed 12/16/2025 6:06 PM
Superior Court - Essex
Docket Number 2577CV00816

- **Stop charging surprise overdraft fees:** Wells Fargo may not charge overdraft fees for deposit accounts when the consumer had available funds at the time of a purchase or other debit transaction, but then subsequently had a negative balance once the transaction settled. Surprise overdraft fees have been a recurring issue for consumers who can neither reasonably anticipate nor take steps to avoid them.
- **Ensure auto loan borrowers receive refunds for certain add-on fees:** Wells Fargo must ensure that the unused portion of GAP contracts, a type of debt cancellation contract that covers the remaining amount of the borrower's auto loan in the case of a major accident or theft, is refunded to the borrower when a loan is paid off or otherwise terminates early.
- **Pay $1.7 billion in penalties:** Wells Fargo will pay a $1.7 billion penalty to the CFPB, which will be deposited into the CFPB's victims relief fund.

Read today's order. 📄

Read CFPB Director Chopra's remarks on a press call announcing the action.

The CFPB wishes to thank members of the public who submitted complaints through the CFPB's complaint system across Wells Fargo product lines. These complaints aided in the detection of some of the illegal activity uncovered in the CFPB's investigation.

The CFPB is also grateful for the cooperation and the substantial work performed by the Office of the Comptroller of the Currency, whose efforts have contributed to the significant remediation received by consumers harmed by the bank's illegal activity, and the Federal Reserve Board of Governors.

Consumers who are experiencing ongoing problems with Wells Fargo, or other financial providers, can submit complaints by visiting the CFPB's website or by calling (855) 411-CFPB (2372). The Bureau also has resources for consumers about mortgage servicing, auto loans, and deposit accounts:

Mortgage servicing: https://www.consumerfinance.gov/consumer-tools/mortgages/

Auto loans: https://www.consumerfinance.gov/consumer-tools/auto-loans/

Deposit Accounts: https://www.consumerfinance.gov/consumer-tools/bank-accounts/

Wells Fargo employees who are aware of other illegal activity are encouraged to send information about what they know to whistleblower@cfpb.gov.

*The Consumer Financial Protection Bureau is a 21st century agency that implements and enforces Federal consumer financial law and ensures that markets for consumer financial products are fair, transparent, and competitive. For more information, visit*

Date Filed 12/16/2025 6:05 PM
Superior Court - Essex
Docket Number 2577CV00816

Essex C... ... ... D... ...ment
C... ...ess D... ...
35 Co... ...reet ...e 2100A
...m, MA 019..

**CERTIFIED MAIL**

7006 1300 0000 4368 5351

US POSTAGE

$ 021.60

Ellen R. Patterson, Senior EX. VP & Gen Counse
420 Montgomery Street
San Francisco CA 94104

25013056

Date Filed 12/16/2025 6:05 PM
Superior Court - Essex
Docket Number 2577CV00816

Date Filed 12/16/2025 6:05 PM
Superior Court - Essex
Docket Number 2577CV00816

15.2

Peter R. Rumbin, plaintiff, pro se

c/o Ms. Katia Baltimore, Secretary

188 Crocker Court, Orange, CT 06472

## COMMONWEALTH OF MASSACHUSETTS

## SUPERIOR COURT-ESSEX COUNTY

**PETER R. RUMBIN,**            Case No. **2577CV00816**

Plaintiff,

VS

**OFFICE OF THE GENERAL COUNSEL, US DEPT OF EDUCATION**

**MS. SHERI CANN, CEO. PRESIDENT, F.H. CANN & ASSOCIATES (NORTH ANDOVER, MASS),**

**SCOTT BASSENT, DEPT OF THE TREASURY**

**ELLEN R. PATTERSON, SENIOR EX. VP., GENERAL COUNSEL, WELLS FARGO & CO.**

**ELIZABETH SHANIN, VP & GENERAL COUNSEL, UNIVERSITY OF CHICAGO, DEFENDANTS**


**PLAINTIFF'S OBJECTION TO THE DEFENDANT, ELLEN R. PATERSON'S MOTION TO DISMISS, AND ARGUMENTS FOR LEVYING DAMAGES AND CESSATION OF FURTHER LITIGATION AGAINST THE PLAINTIFF, PETER R. RUMBIN.**

I.        **INTRODUCTION**

Defendant Ellen R. Patterson is the Executive Vice President of Wells Fargo and Co. and has jurisdiction over the operation of the bank and therefore should be empowered to award just compensation to the plaintiff. The sheriff of Massachusetts served the defendants according to the rules of

civil procedure and for the Essex Superior Court. If the service was defective the clerk of the court would have notified the sheriff and plaintiff, but no such objection has been raised by the court clerk or judge. The plaintiff, Peter R. Rumbin, hereby objections to the defendant's motion to dismiss because the defendants have lost their case already before the General Counsel, US Dept of Education. The General Counsel found the defendants guilty of predatory lending, embezzlement and fraud in connection with their student loans. The plaintiff submitted a "borrower defense application" (with Ira B. Grudberg, ESQ) and it was approved. The debt was discharged (see attached letter).

## II.    FACTUAL ALLEGATIONS

Wells Fargo and associates acquired Connecticut Savings Bank in 2010. (see attached). Hence Wells Fargo and Ellen Patterson are accountable for these student loans.

## III.   ARGUMENT

US Depts of ED and Treasury commenced "offsets" in 2011 when due process was revoked by US Congress and thus required the plaintiff to file suit against the defendants to stop the seizure of money and property by the defendants. After March 24, 2025, the General Counsel halted "offsets" by the US Depts of ED and Treasury and has affirmed its wrongdoing by refunding the funds that it had offset from 2011-2025 and hence acknowledged the predatory lending of the defendants.

 In 2024, the US Treasury executed its "claw back program" against the plaintiff for four months during which time he had no income and no medical health insurance. The defendants have behaved in a draconian manner since 1978-79 until the present. Even though all the defendants have been noticed about the affirmation of their predatory lending- irregular financial aid practices by the General Counsel of the US Det of ED, the defendants continue to engage in useless litigation instead of simply compensating the plaintiff for legal costs and damages spanning over 48 years.

Date Filed 12/16/2025 6:56 PM
Superior Court - Essex
Docket Number 2577CV00816

The borrower defense program-predatory lending litigation commenced when President Joe Biden advocated for loan reforms and financial aid reforms for poor students who were being saddled with unmanageable debts.  President Joe Biden filed a writ of certiorari to SCOTUS on August 24,2022and court announced its decision September 31, 2022. Ira Grudberg, Esq had joined Biden's writ of certiorari to SCOTUS.

Sweet vs Cardona (Sweet vs McMahon) class action settlement became effective January 28th, 2023. Ira B. Grudberg, ESQ is counsel of record for the class action suit with Harvard Legal Services on Predatory Lending with Harvard Professor of Law, Alan Dershowitz et al. The class action requiring the US Dept of Ed to review borrower defense applications and compelled the General Counsel of the US Dept of Ed to review the plaintiff's borrower defense application. This application was approved, and the defendants were found guilty of predatory lending. (See attached as aforementioned letter).

In 1989-1990, US Dept of Justice (Chicago, ILL and In Bridgeport, CT) sued Peter Rumbin (then defendant) for the student loans.  The US Depts of Justice and Treasury lost their case before the late honorable Judge Warren Eginton (Bridgeport CT) by stipulated agreement of the parties, dismissed with prejudice against them. (already entered as an exhibit by defendants) Judge Eglinton met with defendant, Peter R. Rumbin, held hearings with the defendant, and his legal counsel Ira Grudberg. Judge Eginton realized that the defendants were engaging in what is today called predatory lending. The defendants lost their case in 1990 ruling.

In 2011-2025, offsets commenced with the revocation of due process required in the 1989-1990 case. Honorable Charles S. Haight, Jr. refused to hold hearing or acknowledge any of the plaintiff's pleadings. Even after the US Second Circuit Court of Appeals ordered Judge Haight to hold a hearing and review his ruling, he refused. Thus, ignoring the Appeals court directive.

Ira B. Grudberg, Esq filed a writ of certiorari to SCOTUS on behalf of the plaintiff on January 28,2020. (Boston Supreme Court Press). This was followed

Date Filed 12/16/2025 6:05 PM
Superior Court - Essex
Docket Number 2577CV00816

by Grudberg joining President Joe Biden's writ of certiorari to Scotus on August 24,2022 followed by its announcement September 31, 2022.

Ira Grudberg, Esq then joined the class action suit Sweet vs Cardona as counsel of record for the plaintiff. The Sweet vs Cardona ruling compelled the General Counsel of the US Dept of Ed to re-consider and review its previous denials of the plaintiff's borrower defense applications. General Counsel of the US Dept of ED discharged the debts March 25th, 2025, and found the defendants guilty of predatory lending and "irregular financial aid practices."

Ira Grudberg, Esq commenced litigation in Mass Superior for legal costs, damages, restitution, punitive damages, violations of consumer protection law etc. on behalf of the plaintiff. Attorney Ira Grudberg died recently. Plaintiff requires the assistance and representation of legal counsel.

The court and Honorable Judge Jeffery Karp should take note that the U. of Chicago was claiming monies owed to it when it had PELL/BEOG and loan funds (See attached). It is not possible to ascertain what the defendants were doing with these funds at their disposal. However, the defendants did financially and substantially enrich themselves. Likewise, the other letters affirm the struggle to obtain any transcript from the U. of Chicago even into 1990. Plaintiff has never received any accurate accounting of his academic record. Ira Grudberg played "telephone tag" with Dean of Students, Lorna Strauss (U. of Chicago) to obtain a document of acceptability stating that the plaintiff was in "good standing" for education elsewhere required by other colleges for over three years.

The plaintiff has experienced difficulties stemming from the ongoing student loan matter that has negatively impacted his education, employment and credit worthiness. Plaintiff's credit score is "zero" because of the student loan debt that has been reported and derogatory comments from the defendants. Credit scores are now used for employment and educational admissions. Hence the necessity to terminate the defendants' litigation and recovery of compensation for fallout caused from all the student loans for the past 48 years.

Ira Grudberg understood the ramification of the student loans and predatory lending how they would manifest themselves as loss of monies (offsets and claw backs) and seizure of property resulting in poverty and homelessness for the plaintiff. The court must hear the case and order awarding of damages, restoration of credit and halt the futile litigation of the defendants.

Attorney Ira Grudberg has been counsel of record from the 1989-1990 suit, yet these defendants never reached out to him even when he wrote to them nor telephone him. He wrote to the legal counsel of Wells Fargo Bank when he filed the writ of certiorari, and no one ever contacted him.  Only now that this civil action has been filed in Essex Superior Court (Mass) and the plaintiff is represented pro se, have the defendants' filed pleadings.

This case has been decided favorably for the plaintiff three times. The plaintiff requests that the court deny the defendants' motion to dismiss because it is the only fair and reasonable decision to render just as the General Counsel of the US Dept of Education has decided to discharge the student loan debts because of the defendants predatory lending. The writ of certiorari and addendum and plaintiff's supporting documents present the most comprehensive discussion of this student loan case and   Grudberg is counsel of record. F.H. Cann & Associates were revealed after the writ was submitted to SCOTUS. William Dow, Esq. is the only surviving partner of Jacobs, Grudberg, Belt and Dow, 350 Orange St., New Haven, CT 06510.

The only litigant eligible to access res judicata, laches etc. is the plaintiff, Peter R. Rumbin, originating from the 1990 dismissal with prejudice against the defendants by stipulated agreement of the parties, (please see Grudberg's writ of certiorari and pleadings from the late Robert C. Ruggiero, Jr. with plaintiff, and stipulated agreement-Judge Eginton). The defendants should find it legally impossible to avail themselves to res judicata, laches, or estoppel from Judge Edginton's 1990 ruling because this pertains to Peter Rumbin's case before Judge Edginton when the U.S. Dept. of Ed and Treasury sued him for the student loans. It is applicable to the plaintiffs in the 2011 law

suit (see writ of certiorari etc. pleading by Attorney Robert C. Ruggiero. and Peter R. Rumbin).

The 2011 suit brought against the defendants in US District Court before faced serious challenges because of Judge Charles S. Haight's biased and unreasonable conduct in his conduct of the case and his rulings were found objectionable by the US Second Circuit Court of Appeals' judges. The US Second Circuit Court of Appeals remanded the case back to Judge Haight to hold a hearing and review his decision, but he refused to do so. Furthermore, the defendants are prevented from availing themselves to Haight's rulings because the class action ruling of Sweet vs Cordona supersedes Judge Haight ruling and confirms the ruling of culpability of the defendants for their predatory lending and irregular financial aid practices. Ira Grudberg, Esq joined this class action with Harvard Legal Services et al. Finally in 2025, the General Counsel of the US Dept of Ed discharged the debts of the plaintiff and admitted its wrong doing in executing offsets of funds from 2011- 2025 from the plaintiff.

 Fair Jurisprudence requires that a judge hold hearings and act to uphold the law and protect the most vulnerable- i.e. the plaintiff from the ravages of unlawful seizure of monies and properties by the defendants. Judge Haight earned the reputation as a cruel mean-spirited judge who came from New York and became the nemesis of lawyers involved in bankruptcy matters. Thus, he should not have even been handling the plaintiff's student loan case. However, the that US Attorney Christine Sciarrino worked in the nearby office, and she had agreed to and signed the stipulated agreement of the parties dismissed with prejudice against them in 1990 before Judge Warren Eginton in US District Court (Bridgeport, CT) was angry that she had lost the case so when due process was revoked by Congress, she seized the opportunity to commence the unlawful seizure of the plaintiff's income every month by erroneously claiming that all of the loans were not included in the stipulated agreement! This was a falsehood, and the rulings uphold this fact. She never appealed or attempted to modify the 1990 stipulated agreement of dismissal with prejudice – a court order signed by Judge Eginton who held hearings and

6

met with Peter R. Rumbin and legal counsel. The offsets against the plaintiff were levied from 2011 until the 2025 discharging of the debt.

Judge Haight failed in his execution of his duties as a judge which is why Attorney Ira Grudberg filed two writs of certiorari to SCOTUS, a class action suit with Harvard Predatory Lending et al and borrower defense applications to the General Counsel of the US Dept of ED. Grudberg won the class action and the borrower defense application that then discharged these debts, recovered offsets monies and now demands recover of legal costs, damages, restitution, punitive damages etc. and termination of the defendants litigation in order to deny justice for the plaintiff. Grudberg also won the 1990 suit brought against Peter R. Rumbin, (then defendant) in US District Court (Bridgeport, CT) before Honorable Judge Warren Eginton. Grudberg said that "unless you uphold the rule of law, there will be no law to uphold." I regret that Attorney Grudberg is not alive to file this answer himself, but it is based upon the plaintiff's last conversations with legal counsel.

No one will ever know what and how U. Of Chicago, Wells Fargo Bank, F.H.Cann& Associates and US Depts of Ed and Treasury did with the grant funds and loans that it had in its possession with the plaintiff's education expenses. We do know that upon investigation by the US Dept of Ed in Chicago, the U. of Chicago refunded the grant funds that it had committed fraud and embezzlement but did not spend them to pay the plaintiff's education bill. We also have a note for a debt sum but we can never know what transpired within the U. of Chicago's financial aid office. One financial aid officer who resigned her position informed the plaintiff that she quit because she was being asked to do dishonest bookkeeping. She is listed on the interrogatories and discovery documents. (see attached)

The negative impact of the zero-credit reporting score, lack of transcript and disruption of education, employment and career are all a direct consequence of the actions of the defendants (See attached documents) We now know that schools and employers all use an algorithm that incorporates your credit

7

score and academic credentials etc. So, the defendants' decades of sabotage has been deleterious for the plaintiff's life.

The U. of Chicago has increased its endowment to 10.4 billion dollars and some of those funds were obtained by these "irregular financial aid endeavors and predatory lending". Wells Fargo Bank that acquired the Connecticut Savings Bank has total worth of 183.01 billion dollars and income of 5.59 billion dollars according to the information available to the public library. Thes defendants engaged in these loan programs to enrich themselves. The defendants profited from the exploitation of the financial aid programs and simply increased fees and tuition costs, passed them onto the poor students and saddled them with more debt meanwhile the administrators increased their own salaries to millions of dollars. The plaintiff is one of the few students who caught the defendants in the act of their "irregular financial practices" and has been punished ever since by them. Hence the court must intervene and correct this wrong. Only then can justice, restitution and compensation mend the harm that they have collectively caused to the plaintiff. Ellen Patterson is the legal representative of Wells Fargo Bank who acquired Connecticut Savings Bank in 2010. (see attached).

Concerning service, the Massachusetts' served the defendants according to the Massachusetts laws. If the service is lacking in any way this should be communicated to the sheriff. However, the court has accepted the complaint and service upon the defendants.

There is no statute of limitations because the offsets occurred from 2011 to 2025 and any statute of limitations would toll from the most recent offsets of funds seized from the plaintiff. Apriori their barring from statutory limitations fails.

Respectfully submitted,

Peter R.Rumbin, Plaintiff, pro se

c/o Ms. Katia Baltimore, Secretary,188 Crocker Court, Orange, CT 06472

Dated this December 2, 2025

Certification

A copy of the above was sent by US Mail to the defendants on December 2, 2025, listed herein:

University of Chicago and Elizabet Shanin

Daniel J. Cloherty (BBO #565772)

Cloherty & Steinberg LLP

One Financial Center, Suite 1120

Boston, MA  02111,  617-481-0160

Judah H. Rome

Troutman Pepper Locke LLP

One Financial Plaza, Suite 2800

Westminster St.

Providence, RI  02903 ,  401-276-6433

Antonio Calvagno, Esq.

c/o F.H. Cann & Associates, Inc.

1600 Osgood St., Suite 3058

North Andover, MA 01845,  978-973-8593

U.S. Dept. of Education –  Predatory Lending Student Loan Borrower Defense

400 Maryland Ave, SW, Washington, D.C. 20202

Date Filed 12/16/2025 6:05 PM
Superior Court - Essex
Docket Number 2577CV00816

EXHIBIT A

Date Filed 12/16/2025 6:05 PM
Superior Court- Essex
Docket Number 2577CV00816

Peter R Rumbin
87 2Nd St
Hamden, CT 06514-4711

March 24, 2025

Borrower Defense Application #: 02094713
Borrower Defense Application School: University of Chicago (The)

Dear Peter R Rumbin:

You are receiving this letter because you are a member of the class of Federal student loan borrowers covered by the recent settlement of the *Sweet v. Cardona* ("*Sweet*") lawsuit. You submitted a Borrower Defense to Repayment discharge application relating to your Federal student loan(s) on or before June 22, 2022. The Department of Education, applying a special review process agreed to in the *Sweet* settlement agreement, has approved your claim for settlement relief. For more information on the terms of the settlement agreement please see the Department's website at https://Studentaid.gov/announcements-events/sweet-settlement.

The Department has determined that you are entitled to settlement relief for the loans taken out on or after 4/15/1977 associated with your enrollment at University of Chicago (The) ("Relevant Federal Student Loan(s)") based on your allegations regarding the school's misconduct. Pursuant to the *Sweet* settlement, the Department of Education will do the following:

- discharge your Relevant Federal Student Loan(s);
- provide a refund for any payments made to the Department of Education on your Relevant Federal Student Loans, including Relevant Federal Student Loan debt that you previously paid off; and
- delete the credit report tradeline associated with the discharged loan(s).

The benefits described in this communication apply to your Relevant *Federal* Student Loan(s). The benefits do not apply to private loans. Discharging your Relevant Federal Student Loan(s) means that you will no longer owe the debt. You also may receive a refund for prior payments made to the Department on your discharged Relevant Federal Student Loan(s) related to University of Chicago (The). Your loan servicer will let you know if you are eligible for a payment refund, which would be mailed to you. Please check your online account with your loan servicer to ensure your address is correct so you can receive any refund.

Other than confirming your address, you do not have to take any further action to receive your discharge. Your servicer will send you more details about the discharge, including which loans have been forgiven. Your Relevant Federal Student Loan debt will remain in forbearance and collections will be stopped until you receive relief. Your credit report will also be updated to reflect this discharge when it is complete.

If you have questions about this notice, please call our borrower defense hotline at 1-855-279-6207. You may visit https://studentaid.gov/Contact for our hours of operation.

Sincerely,
U.S. Department of Education
Federal Student Aid



# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,          :

     Plaintiff,          :          Civil No. N 89-522 (WWE)

VS.          :

PETER R. RUMBIN,          :

     Defendant.          :          September 24, 1990

## STIPULATION FOR DISMISSAL

It is hereby stipulated by and between the federal plaintiff, United States of America, on the one hand, and the defendant, Peter R. Rumbin, on the other hand, by and through their respective attorneys as follows:

1. That the parties do hereby agree to the dismissal of the above captioned action with prejudice, each party to bear his own costs and attorney's fees.

2. That the defendant, Peter R. Rumbin agrees to discharge and hold and save harmless the United States of America and the Secretary of the United States Department of Education and their agents, officers and employees from any claims, including costs or expenses for or on account of any and all lawsuits or claims of any character whatsoever, in connection with the subject matter or institution of this action.

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

     Plaintiff,            Civil No. N 89-52   (GWE)

vs.

PETER R. RUMBIN,

     Defendant.          September 26, 1990

MOTION TO DISMISS

Pursuant to Rule 41 of the Federal Rules of Civil Procedure, the federal plaintiff hereby moves the Court to dismiss this action with prejudice, in accordance with the attached Stipulation.

RESPECTFULLY SUBMITTED,

THE PLAINTIFF

BY: STANLEY A. TWARDY, JR.
UNITED STATES ATTORNEY

CHRISTINE SCIARRINO
SPECIAL ASST. U.S. ATTORNEY
915 LAFAYETTE BLVD.
BRIDGEPORT, CT  06604
(203') 579-5596

SEP 7. 1980

PLAINTIFF,

UNITED STATES OF AMERICA

STANLEY A. TWARDY, JR.
UNITED STATES ATTORNEY

DATED SEPTEMBER 24, 1990

CHRISTINE SCIARRINO
SPECIAL ASST. U.S. ATTORNEY
915 LAFAYETTE BLVD.
BRIDGEPORT, CT 06604
(203) 579-5596

DEFENDANT,

PETER R. RUMBIN

DATED SEPTEMBER 25, 1990.

BY:
DAVID A. LEFF, ESQ.
JACOBS, GRUDBERG, BELT & DOW
350 ORANGE STREET
NEW HAVEN, CT 06503
HIS ATTORNEY

DEFENDANT,

PETER R. RUMBIN

DATED SEPTEMBER 25, 1990

BY:
PETER R. RUMBIN
87 SECOND STREET
HAMDEN, CT 06514

2

## US BANK LOCATIONS

Home    Advanced Search    Map    Check Routing Number    Rankings

Login | Create Account

Home > Connecticut Savings Bank

# Connecticut Savings Bank

| | |
|---|---|
| Status: | **Inactive as of 11/14/1991**<br>Absorption – Assisted |
| Successor Bank: | Centerbank |
| Headquarters: | Connecticut Savings Bank<br>47 Church Street<br>New Haven, CT 06501 |
| Established: | 01/01/1857 |
| FDIC Insurance: | 07/01/1960 |
| FDIC Cert: | #18239 |
| Charter Class: | |
| Total Assets: | $1,044,990,000 |
| Total Deposits: | $897,732,000 |

## History

| | |
|---|---|
| 1857-01-01 | Institution established: Original name:The Connecticut Savings Bank of New Haven |
| 1973-07-18 | Changed name to Connecticut Savings Bank |
| 1985-06-13 | Change trust powers from TRUST POWERS NOT GRANTED to FULL TRUST POWERS GRANTED |
| 1991-11-14 | Failed. Acquired with government financial assistance and subsequently operated as part of Centerbank (18262) |
| 1993-07-29 | Change trust powers from FULL TRUST POWERS GRANTED to TRUST POWERS TERMINATED |
| 1994-03-21 | Acquired Bank of Waterbury (26192) in WATERBURY, CT |
| 1995-07-28 | Acquired Founders Bank (26187) in NEW HAVEN, CT as part of a government assisted transaction. |
| 1995-12-15 | Acquired Great Country Bank (18222) in ANSONIA, CT |
| 1996-04-12 | Acquired Heritage Bank (27386) in WATERTOWN, CT |
| 1996-11-14 | Merged into and subsequently operated as part of First Union Bank of Connecticut (9230) in STAMFORD, CT |
| 1997-07-31 | Merged into and subsequently operated as part of First Union National Bank (4885) in CHARLOTTE, NC |
| 1997-07-31 | Acquired First Union National Bank of Tennessee (19879) in NASHVILLE, TN |
| 1997-07-31 | Acquired First Union National Bank of Washington, D.C. (18839) in WASHINGTON, DC |
| 1997-07-31 | Acquired First Union National Bank of Virginia (6904) in ROANOKE COUNTY, VA |
| 1997-07-31 | Acquired First Union National Bank of Maryland (18024) in ROCKVILLE, MD |
| 1997-07-31 | Acquired First Union Bank of Connecticut (9230) in STAMFORD, CT |
| 1997-07-31 | Acquired First Union National Bank of South Carolina (18395) in GREENVILLE, SC |
| 1997-11-29 | Acquired Signet Bank (11589) in RICHMOND, VA |
| 1998-02-26 | Merged into and subsequently operated as part of First Union National Bank (33869) in CHARLOTTE, NC |
| 1998-02-27 | Acquired Signet Trust Company (90613) in RICHMOND, VA |
| 1998-05-15 | Acquired Corestates Bank, National Association (719) in PHILADELPHIA, PA |
| 1998-08-13 | Acquired Mentor Trust Company (33942) in PHILADELPHIA, PA |
| 1998-08-13 | Acquired Mentor Trust Company (Virginia) (34822) in RICHMOND, VA |
| 1999-07-16 | Acquired Keystone Trust Company (34003) in PORTSMOUTH, NH |
| 1999-12-01 | Acquired Meridian Trust Company (26064) in READING, PA |
| 2002-04-01 | Acquired Wachovia Bank, National Association (817) in WINSTON-SALEM, NC |
| 2002-04-01 | Changed name to Wachovia Bank, National Association (33869) |
| 2002-12-31 | Acquired The First National Bank of Atlanta (26747) in NEW CASTLE, DE |
| 2002-12-31 | Acquired Offitbank (33603) in NEW YORK CITY, NY |
| 2003-11-06 | Acquired Atlantic Savings Bank, F.S.B. (32335) in HILTON HEAD ISLAND, SC |
| 2004-12-01 | Acquired First Union Direct Bank, National Association (34483) in AUGUSTA, GA |
| 2005-01-03 | Acquired SouthTrust Bank (849) in BIRMINGHAM, AL |
| 2006-03-01 | Acquired Western Financial Bank, National Association (31954) in Irvine, CA |
| 2007-10-12 | Acquired World Savings Bank Interim, National Association (NY) (58838) in OCEANSIDE, NY |
| 2008-06-01 | Acquired A.G. Edwards Trust Company, FSB (35018) in ST. LOUIS, MO |
| 2010-03-20 | **Merged into and subsequently operated as part of Wells Fargo Bank, National Association (3511) in SIOUX FALLS, SD** |
| 2010-03-20 | Acquired Wachovia Bank of Delaware, National Association (33931) in WILMINGTON, DE |
| 2010-04-10 | Acquired Wachovia Card Services, National Association (58496) in ATLANTA, GA |
| 2010-05-10 | Acquired Wells Fargo HSBC Trade Bank, National Association (34075) in SAN FRANCISCO, CA |

Check Today's Mortgage/Refi Rates

Date Filed 12/16/2025
Superior Court - Essex
Docket Number 2577CV00816

OFFICE OF THE BURSAR
CHICAGO, ILLINOIS 60637

(312) 753-0821

| | STATEMENT | |
| DRIGINAL INVOICE | X |

FROM **Aut** 78 TO **Spr** 7979

PLEASE RETURN THE REMITTANCE COPY
WITH PAYMENT TO THE ADDRESS BELOW:

September 19, 1980

RE: Peter Richard Rubin    ID# 723482

SUBJECT: ITEMIZE STATEMENT FOR THE YEAR 1978-79

OFFICE OF THE BURSAR
UNIVERSITY OF CHICAGO
5801 S. ELLIS AVENUE
CHICAGO, ILLINOIS 60637

| DATE | | | DESCRIPTION | PERIOD | | AMOUNT |
|---|---|---|---|---|---|---|
| 01-22-79 | | | TUITION/ROOM AND/OR BOARD/MAJOR ACTIVITY FEE | AUT | 78 | $1,791.00 |
| | | | HDG | AUT | 78 | 179.00cr |
| | | | PAYMENT | AUT | 78 | 1,791.00cr |
| | | | BALANCE | | | 179.00cr |
| | | | | | | |
| 01-08-79 | | | TUITION/ROOM AND/OR BOARD/MAJOR ACTIVITY FEE | WIN | 79 | $1,791.00 |
| 02-20-79 | | | HDG   *Full Time* | WIN | 79 | 179.00cr |
| | | | PAYMENTS | WIN | 79 | 209.00cr |
| | | | PAYMENTS | WIN | 79 | 600.00cr |
| | | | BALANCE | | | $ 803.00 |
| | | | | | | |
| | | | TUITION/ROOM AND/OR BOARD/MAJOR ACTIVITY FEE | SPR | 79 | $1,791.00 |
| | | | HDG | SPR | 79 | 178.00cr |
| | | | BALANCE | | | 1,613.00 |
| | | | | | | |
| | | | SUMMARY | AUT | 78 | $ 179.00cr |
| | | | | WIN | 79 | 803.00 |
| | | | | SPR | 79 | 1,613.00 |
| | | | BALANCE | | | $2,237.00 |

MAKE CHECKS PAYABLE TO UNIVERSITY OF CHICAGO
PAYABLE IN U.S. DOLLARS

Date Filed 12/16/2025 6:56 PM
Superior Court - Essex
Docket Number 2577CV00816

**JACOBS, JACOBS & GRUDBERG**

A PROFESSIONAL CORPORATION

HOWARD A JACOBS
STANLEY A JACOBS
IRA B GRUDBERG
M MITCHELL MORSE
DAVID L BELT
JAMES A WEZZANOTTE
JEAN L WELTY
WILLIAM F DOW, III
BRUCE D JACOBS
JONATHAN RATZ

350 ORANGE STREET • POST OFFICE BOX 606
NEW HAVEN, CONNECTICUT 06503
TELEPHONE 203 772-3100

ISRAEL J JACOBS 1918-1963

OUR FILE NO.

March 11, 1980

Mrs. Lorna P. Strauss
University of Chicago
Dean of Students in the College
Chicago, Illinois 60637

Dear Dean Strauss:

In response to my letter of February 15, apparently you called my office one Friday. However, three telephone calls since that time have been fruitless in eliciting a response from you.

I am not sure what any of that means, but I would appreciate it if you would get back to me as soon as possible. It has been virtually a month since my letter.

Very truly yours,

JACOBS, JACOBS & GRUDBERG, P.C.

By_____
        Ira B. Grudberg

IBG:dct
cc: Mr. Peter R. Rumbin

Date Filed 12/16/2025 6:06 PM
Superior Court - Essex
Docket Number 2577CV00816

# THE UNIVERSITY OF CHICAGO
### The Office of the University Registrar

CHICAGO, ILLINOIS 60637

MAY 1, 1996

MR. PETER RUMBIN
87 SECOND STREET
HAMDEN, CT. 06514

DEAR MR. RUMBIN:

Your request for a transcript of your academic record has
been received, but a restriction has been placed on your
academic records by STUDENT LOAN CENTER, 970 E. 58TH ST. 4TH
FL, CHICAGO, IL 60637, (312)702-6053 - DENISE LONGDEN.

In keeping with University policy, this office cannot provide
transcript service to students or alumni whose records are
restricted.

Your request and your check (if prepaid) is enclosed. When
the restriction has been cleared by STUDENT LOAN CENTER re-
submit your request and this office will respond immediately.

Sincerely,

Maxine H. Sullivan
University Registrar

MHS/SA
Enclosed
X Request
Check in the amount of
X Not prepaid

# FINANCIAL COLLECTION AGENCIES

| YOU OWE | FINANCIAL COLLECTION AGENCIES (1990) INC. |
|---|---|
| CONNECTICUT STUDENT LOAN | Westgate Center |
| | 3446 Demetropolis Road |
| | Mobile, AL 36693 |

TELEPHONE: 1-800-504-2359

FROM: ▽
P.O. BOX 891834
MOBILE, AL 36691-1834

▽ REFER TO THIS KEY WHEN COMMUNICATING
WITH THIS OFFICE

| YOUR ACCOUNT NUMBER | KEY |
|---|---|
| 044387325 | BP0409 0767 03807005 BF |

| AMOUNT OWED | OTHER CHARGES | TOTAL OWED |
|---|---|---|
| $5172.60 | $5602.43 | $10775.03 |

TO: ‖KEY‖BP0409 0767 03807005‖M2BF‖1535
► PETER R RUMBIN
   87 SECOND ST

   HAMDEN CT 065140000

DATE
MAY 23, 1996

PETER R RUMBIN

Regrettably you have failed to respond to our communication concerning your delinquent account with
CONNECTICUT STUDENT LOAN.

While it is still our desire to resolve this matter without inconvenience to you, this is an attempt
to collect a debt. Any information obtained will be used for that purpose.

We trust your better judgment will prompt you to arrange for payment of this account without further
delay. You are urged to remit payment in the enclosed envelope . . . or . . . at the very least to
call our office at the telephone number shown above, to discuss the matter.

The "TOTAL OWED" shown above may, or may not include interest and or other costs, as per the terms of
your agreement with your original creditor.

For your convenience, this account may be paid with Visa or Mastercard.

---

**PAYMENT SLIP**   Detach this payment slip and return with your remittance.   PLEASE COMPLETE AND RETURN IN THE ENCLOSED ENVELOPE.

| YOU OWE | YOUR ACCOUNT NUMBER | KEY |
|---|---|---|
| CONNECTICUT STUDENT LOAN | 044387325 | BP0409 0767 03807005 BF |

DATE
MAY 23, 1996

FROM: ▷   PETER R RUMBIN
         87 SECOND ST
         HAMDEN CT 065140000

‖KEY‖BP0409 0767 03807005‖M2BF

FINANCIAL COLLECTION AGENCIES
P.O. BOX 1007
SOUTHEASTERN, PA 19399-1007

ENTER
AMOUNT PAID ▷ $

I can be reached at:

| TEL. (DAY): | TEL. (EVENING): |
|---|---|
| | |

KE1535 021093



U.S. POSTAGE PAID
FCM LG ENV
HAMDEN, CT 065
DEC 03, 2025
$2.44
S2924M501681-87

Retail

RDC 99



Judah H Rome
Troutman Pepper Locke LLP
One Financial Plaza, Suite 2600
Westminster St
Providence RI 02903

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                                    SUPERIOR COURT DEPARTMENT

PETER R. RUMBIN,

       Plaintiff,

    v.                                      CIVIL ACTION NO.  2577CV00816

OFFICE OF THE GENERAL COUNSEL,
U.S. DEPARTMENT OF EDUCATION,
MS. SHERI CANN, CEO, PRESIDENT,
F.H. CANN & ASSOCIATES, SCOTT
BESSENT, DEPARTMENT OF THE U.S.
TREASURY, ELLEN R. PATTERSON,
SENIOR EX. V.P., GENERAL COUNSEL,
WELLS FARGO & CO., ELIZABETH
SHANIN, V.P. & GENERAL COUNSEL,
UNIVERSITY OF CHICAGO,

       Defendants.



**DEFENDANT ELLEN R. PATTERSON'S REPLY MEMORANDUM
IN SUPPORT OF HER MOTION TO DISMISS THE COMPLAINT**

       Defendant Ellen R. Patterson ("Ms. Patterson") named in her capacity as Executive Vice

President and General Counsel of Wells Fargo & Co., by counsel, hereby submits this Reply

Memorandum in further support of her Motion to Dismiss.   This Court should allow Ms.

Patterson's Motion and Dismiss all claims against her with prejudice because Plaintiff has not

rebutted the legal arguments that were raised in Ms. Patterson's Memorandum of Law.

**I.**      **INTRODUCTION**

       Even giving Plaintiff the benefit of the doubt and every accommodation that can be

afforded to a *pro se* litigant, his pleading entitled "Plaintiff's Objection to the Defendant, Ellen R.

Paterson's (*sic*) Motion to Dismiss, and Arguments for Levying Damages and Cessation of Further

Date Filed 12/16/2025 6:05 PM
Superior Court - Essex
Docket Number 2577CV00816

Litigation Against the Plaintiff, Peter R. Rumbin" (hereinafter, the "Opposition") is nonsensical. Plaintiff's Opposition fails to show how the Complaint connects Ms. Patterson or Wells Fargo to Plaintiff's alleged injuries.  In her Motion to Dismiss, Ms. Patterson identified five independent reasons Plaintiff's Complaint should be dismissed: (1) the Complaint fails to contain a short and plain statement demonstrating Plaintiff is entitled to relief from Ms. Patterson; (2) the Complaint fails to state a claim upon which relief may be granted; (3) Plaintiff's claims are barred by the doctrine of *res judicata*; (4) any claim related to predatory lending is time-barred; and (5) Ms. Patterson is not able to produce Plaintiff with the requested relief.  In his Opposition, Plaintiff does not rebut these arguments such that the Complaint may survive.

## II.    ARGUMENT

Plaintiff's rambling argument in his Opposition does nothing to address the deficiencies in his Complaint.  Plaintiff's Opposition attempts to push back on two of Ms. Patterson's legal arguments: (1) that service was improper (*see* Opp. at *1-2); and (2) that *res judicata* does not apply (*see* Opp at *5).  However, Plaintiff does not cite a single case, allegation from his Complaint, or other fact to support his arguments.  And, even if Plaintiff is correct that service was proper and *res judicata* does not apply (he is not), Ms. Patterson has raised other arguments that are more than sufficient for this Court to dismiss Plaintiff's Complaint with prejudice.

Moreover, in an effort to try to make sense of his claims, in the Opposition, Plaintiff seeks to add a new factual allegation, claiming that Wells Fargo acquired Connecticut Savings Banks in 2010. *See* Opp at * 2.  This fact was not alleged in the Complaint and, as such, is not appropriately considered at the Motion to Dismiss phase. *See Fletcher Fixed Income Alpha Fund, Ltd. v. Grant Thornton LLP*, 89 Mass. App. Ct. 718, 727, 54 N.E.3d 570, 578 (2016) (holding that at the motion to dismiss phase, "[t]he plaintiff's claim must be based on facts set forth in the complaint; all

materials outside the pleadings are excluded in this review"). But even if it were properly alleged, the fact that Wells Fargo acquired another bank in 2010 does not discount in any manner the issues raised in Ms. Patterson's Motion to Dismiss.

## III.   **CONCLUSION**

For the reasons stated herein and those stated in Ms. Patterson's Motion and accompanying Memorandum of Law, this Court should dismiss Plaintiff's Complaint with prejudice.

Dated:  December 16, 2025                              Respectfully submitted:

*/s/ Judah H. Rome*
Judah H. Rome
BBO# 695997
TROUTMAN PEPPER LOCKE LLP
One Financial Plaza
Suite 2800
Westminster Street
Providence, RI 02903
Phone: 401-276-6433
Email: judah.rome@troutman.com

*Attorneys for Defendant*
*Ellen R. Patterson*

Date Filed 12/16/2025 6:03 PM
Superior Court - Essex
Docket Number 2577CV00816

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 16, 2025, I caused a true and accurate copy of the

foregoing to be sent via U.S. mail to the following:

Peter R. Rumbin                          Katia Baltimore
87 Second Street                         188 Crocket Court
Hamden, CT 06514                         Orange, CT  06472

The foregoing was additionally served by email on all counsel of record.

/s/ Judah H. Rome
Judah H. Rome

4

15.4

COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                                      SUPERIOR COURT DEPARTMENT

PETER R. RUMBIN,

     Plaintiff,

    v.                                          CIVIL ACTION NO.  2577CV00816

OFFICE OF THE GENERAL COUNSEL,
U.S. DEPARTMENT OF EDUCATION,
MS. SHERI CANN, CEO, PRESIDENT,
F.H. CANN & ASSOCIATES, SCOTT
BESSENT, DEPARTMENT OF THE U.S.
TREASURY, ELLEN R. PATTERSON,
SENIOR EX. V.P., GENERAL COUNSEL,
WELLS FARGO & CO., ELIZABETH
SHANIN, V.P. & GENERAL COUNSEL,
UNIVERSITY OF CHICAGO,

     Defendants.


A TRUE COPY ATTEST
DEPUTY ASS'T. CLERK

## NOTICE OF FILING AND LIST OF DOCUMENTS FILED
## PURSUANT TO RULE 9A

    Defendant Ellen R. Patterson ("Ms. Patterson") named in her capacity as Executive Vice

President and General Counsel of Wells Fargo & Co., by counsel, hereby states that the following

documents were filed in accordance with Superior Court Rule 9A this day, December 16, 2025:

1. Defendant Ellen R. Patterson's Motion to Dismiss;

2. Memorandum in Support of Defendant's Motion to Dismiss;

3. Plaintiff Peter R. Rumbin's Objection to the Defendants Motion to Dismiss;

4. Defendant, Ellen R. Patterson's Reply Memorandum in Support of her Motion to
   Dismiss; and

5. Notice of Filing and List of Documents Filed Pursuant to Rule 9A.

322772346v1

Dated:  December 16, 2025                    Respectfully submitted:


                                            */s/ Judah H. Rome*
                                            Judah H. Rome
                                            BBO# 695997
                                            TROUTMAN PEPPER LOCKE LLP
                                            One Financial Plaza
                                            Suite 2800
                                            Westminster Street
                                            Providence, RI 02903
                                            Phone: 401-276-6433
                                            Email: judah.rome@troutman.com

                                            *Attorneys for Defendant*
                                            *Ellen R. Patterson*




## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2025, I caused a true and accurate copy of the foregoing to be sent via U.S. mail to the following:

Peter R. Rumbin                      Katia Baltimore
87 Second Street                     188 Crocket Court
Hamden, CT 06514                     Orange, CT  06472


The foregoing was additionally served by email on all counsel of record.

                          */s/ Judah H. Rome*
                          Judah H. Rome

,

Peter R. Rumbin, plaintiff, pro se
c/o Ms. Katia Baltimore, Secretary
188 Crocker Court, Orange, CT 06472

## COMMONWEALTH OF MASSACHUSETTS
## SUPERIOR COURT-ESSEX COUNTY

**PETER R. RUMBIN,**
Plaintiff,
VS                     Case No. **2577CV00816**

**OFFICE OF THE GENERAL COUNSEL, US DEPT OF EDUCATION**
**MS. SHERI CANN, CEO. PRESIDENT, F.H. CANN & ASSOCIATES (NORTH ANDOVER MASS),**
**SCOTT BASSENT, DEPT OF THE TREASURY**
**ELLEN R. PATTERSON, SENIOR EX. VP., GENERAL COUNSEL, WELLS FARGO & CO.**
**ELIZABETH SHANIN, VP & GENERAL COUNSEL, UNIVERSITY OF CHICAGO,**
**DEFENDANTS**

### PLAINTIFF'S OBJECTION TO THE MOTION TO DISMISS FROM THE U. OF CHICAGO AND AND ELIZABETH SHANIN and F.H. CANN & ASSOCIATES

The Plaintiff is prop se and Ira Grudberg, Esq is deceased. From 1979-2025 the defendants never contacted plaintiff's legal counsel by phone or mail. However now that he is dead, they are all trying to avoid paying damages for the harm that they all caused to the plaintiff for 48 years. The defendants are simply generating pleadings because the plaintiff is not a lawyer.

The fact of the matter is that the General Counsel of the US Dept of Education has found the defendants guilty of predatory lending, fraud and embezzlement. The U. of Chicago upon investigation by the U S Dept of Ed in Chicago, refunded the PELL/BEOG funds that the U of Chicago had in its possession but had no applied it to pay the plaintiff's education bill and then borrowed money in this same year. This only happened for that one year and the plaintiff withdrew from the U. of Chicago. Harvard financial aid discovered these "financial aid irregularities" when it requested a financial aid transcript. The defendants were enriching themselves at the expense of the students of need by treating

A TRUE COPY ATTEST

DEPUTY ASS'T. CLERK

as students of means. Plaintiff never borrowed again for his education and attended Harvard, and elsewhere on a full scholarship.

The General Counsel has access to all of the financial records and information about these defendants' malfeasance. Why the defendants continue to file motions to dismiss when they have been found guilty of predatory lending is perplexing. The defendants have been found guilty of predatory lending in the 1989-1990 case dismissed with prejudice against them by stipulated agreement of the parties. The defendants lost the class action suit Sweet vs Cardona in US District Court North District of California after an intense battle with Harvard Law School et al.  No purpose is served to repeat this exercise. The court simply must hold a hearing for damages and order the defendants to pay damages and legal costs.

The relief sought from the defendants is money—the only thing that the defendants can provide to the plaintiff for the 48 years of troubles that they caused and the legal costs associated with their predatory lending. The plaintiff's credit worthiness is zero because their negative and derogatory comments. Statute of limitation question cannot be used by the defendants as a defense to avoid paying for damages.

In 2011 the US Congress removed due process and commenced offsets until 2025. In 2024 for four months the US Treasury and Education executed their "Claw Back" when they offset 100 percent of the income of the plaintiff and medical insurance. The US Depts of Ed and Treasury have acknowledged their mistake and discharged the debts (see letter

discharging the debt). But the defendants are refusing to accept the fact that they have lost their case before the General Counsel of the US Dept of ED in Washington, DC.

The statute of limitation seems to be a moot point as a defense for the defendants. They simply cannot avoid their conviction by the General Counsel. The

Ira Grudberg, ESQ stated: When we win, will make money". The plaintiff has won and now it is time for the plaintiff to be paid for damages and legal costs by the defendants. They cannot recover the 48 years of hardship, disruption and damages that they caused by their corporate greed. All of the defendants unjustly enriched themselves to the detriment of the plaintiff. None of these defendants once previously appeared in any court proceeding with legal counsel, Ira Grudberg, Esq.

The Rumbin vs Duncan was ignored by the class action suit and borrower defense application- predatory lending litigation because Judge Haight, Jr. conduct was found to be prejudiced, and ignored the Second Circuit Court of Appeals directives. He refused to hold any hearing or listen to any pleadings from the plaintiff. The Sweet vs Cardona class action case supersedes Judge Haight as does the General Counsel of the US Dept of Education. Judge Haight and US Attorney Christine Sciarrino both worked together because of the ruling issued by Judge Warren Eginton in 1990 that US Attorney Christine Sciarrino had signed. She then lied to the court in the 2011 case when she said all the loans were not included—which was a lie to the court. She had never appealed or attempted to modify the 1990 ruling—a court order signed by Judge Eginton. Judge Haight refused to remand the case to Judge Eginton, too.

Ira Grudberg filed two writ of certiorari to SCOTUS one with President Joe Biden which led to the class action law suit, Sweet VS Cardona and its consequent ruling for the borrower defense program that the plaintiff applied to and won in 2025. The defendants cannot go back to Judge Haight for legal defense.

Attorney Antonio Calvagno (F.H.Cann) also cannot accept the class action ruling and the General Counsel rulings. Unless the defendants can only be convinced of this reality by a court order issued by the judge in this case. Ira Grudberg said that these defendants would be trouble and he was correct but as pro se I am not able to draft a point-by-point counter argument to them. But Ira Grudberg has written a writ of certiorari to SCOTUS and an appendix that the presiding judge should peruse and its clear exegesis can provide a bulwark against the defendants' motions to dismiss as pointless.

When the defendants have lost their case three times, it is more honorable and respectable to acknowledge culpability and make a generous monetary settlement to the plaintiff. Any other questions that the court has in this matter the plaintiff will do his best to respond to, but legal representation is required immediately. Plaintiff has contacted all the law schools and legal aid organizations for representation.

The student loan case was discharged in 2025 but the defendants have not paid damages and legal costs for the past 48 years and that is the point of the complaint. If you do not like it in Massachusetts perhaps it could be transferred to the Connecticut Superior Court. But the case against these defendants is not settled until legal costs and damages are paid in full to the plaintiff. They objections make it obvious that they all know that the plaintiff is owed generous compensation.

Ira Grudberg would insist upon it after defending the plaintiff against them and their

seizure of the plaintiff's money and property.  Last night at the "ask a lawyer" session in

New Haven, the lawyer told the plaintiff that he must follow through to prevent the

defendants from seizing his property (house etc.) and recover money from them all for their

greedy predatory lending behavior.

Former Illinois Attorney Lisa Madigan closed colleges and fined them for their predatory

lending and irregular financial aid practices. Noam Chomsky say that legal details should

not abrogate the legitimacy of a plaintiff's claim for justice and rightful compensation.

Respectfully submitted,

Peter R. Rumbin, Plaintiff, pro se
c/o Ms. Katia Baltimore, Secretary,188 Crocker Court, Orange, CT 06472
Dated this December 12, 2025
Certification
A copy of the above was sent by US Mail to the defendants on November 24, 2025, listed
herein:
University of Chicago and Elizabet Shanin
Daniel J. Cloherty (BBO #565772)
Cloherty & Steinberg LLP
One Financial Center, Suite 1120
Boston, MA  02111 , 617-481-0160
Judah H. Rome
Troutman Pepper Locke LLP
One Financial Plaza, Suite 2800
Westminster St.
Providence, RI  02903 , 401-276-6433
Antonio Calvagno, Esq.
c/o F.H. Cann & Associates, Inc.
1600 Osgood St., Suite 3058
North Andover, MA 01845,  978-973-8593
U.S. Dept. of Education -  Predatory Lending Student Loan Borrower Defense
400 Maryland Ave, SW, Washington, D.C. 20202

FILED
ESSEX SUPERIOR COURT
2025 DEC 17 A 11: 53

COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT – ESSEX COUNTY

Peter R. Rumbin,

      Plaintiff,

            vs.

- **Office of the General Counsel, US Dept of Education;**
- **Sheri Cann, CEO and President of F. H. Cann & Associates;**
- **Scott Bassent, Department of the US Treasury;**
- **Ellen R. Patterson, Senior Ex. VP, General Counsel, Wells Fargo & Co.;**
- **Elizabeth Shanin, VP & General Counsel, University Of Chicago.**

      Defendants

**Civil Case No. 2577CV00816**

**DEFENDANT SHERI CANN, PRESIDENT OF F.H. CANN & ASSOCIATES, INC.'S**

**MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

**For Failure to State a Claim Upon Which Relief Can Be Granted**

Pursuant to Superior Court Rule 9A, the Defendant, F.H. Cann & Associates, Inc.

("FHC"), by and through its undersigned counsel, respectfully moves this Honorable Court to

dismiss Plaintiff's Complaint in its entirety pursuant to Mass. R. Civ. P. 12(b)(6), for failure to

state a claim upon which relief can be granted, as better detailed in the accompanying

Memorandum of Law.

December 12, 2025.

\* Signature on the next page \*



- 1 -

Date Filed 12/19/2025 10:03 AM
Superior Court - Essex
Docket Number 2577CV00816

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Sheri Cann, President of F.H. Cann & Associates, Inc

By her attorney,

*/s/ Antonio Calvagno*
Antonio Calvagno (BBO 708180)
c/o F.H. Cann & Associates, Inc
1600 Osgood St., Suite 3058
North Andover, MA 01845
Phone: 978.973.8593
Email: acalvagno@fhcann.com
Antonio Calvagno, Esq.

**CERTIFICATE OF SERVICE**

I, Antonio Calvagno, hereby certify that on December 12, 2025, a true copy of the above document was served via first class mail upon:

-   PETER R. RUMBIN, 87 Second St., Hamden, CT 06514

-   KATIA BALTIMORE, 188 Crocker Court, Orange, CT 06472

The above document was additionally served by email on all counsel of record.

*/s/ Antonio Calvagno*
Antonio Calvagno

**CERTIFICATION PURSUANT TO SUPERIOR COURT RULE 9C**

I hereby certify that on December 11, 2025, at 3:40 p.m., I made a good-faith attempt to confer with Plaintiff Peter Rumbin by telephone at (203) 494-5229 to narrow the areas of disagreement. I was unable to reach Mr. Rumbin or Ms. Baltimore at that time. Later that same day, at 8:47 p.m., Mr. Rumbin returned my call from (475) 321-3456; however, the parties were unable to reach any agreement.

*/s/ Antonio Calvagno*
Antonio Calvagno